[Civ. No. 18717. Third Dist. June 19, 1981.]

SKYLINE HOMES, INC., Plaintiff and Appellant, v.
OCCUPATIONAL SAFETY AND HEALTH APPEALS BOARD,
Defendant and Respondent;
DIVISION OF INDUSTRIAL SAFETY, Real Party in Interest and
Respondent.

COUNSEL

Reid, Babbage & Coil, David G. Moore, Philip P. Marskey and Ingoglia, Marskey & Kearney for Plaintiff and Appellant.

Robert A. Heron, Elise Manders and Keith Yamanaka for Defendant and Respondent.

Michael D. Mason and Paul Freud Wotman for Real Party in Interest and Respondent.

OPINION

**REYNOSO, J.**—Plaintiff argues that the manufacture of mobilehomes is governed by the state's *construction* safety orders and not the *general industry* safety orders. We hold that in the construction of mobilehomes in an assembly plant, as later described, the construction safety orders are inapplicable; accordingly, such a manufacturing operation is appropriately covered by the safety orders which apply to general industries. We affirm the trial court's denial of the petition for a writ of mandate.

Skyline Homes, Inc., a California corporation doing business as Buddy Mobile Homes, petitioned the Superior Court of Sacramento County for a writ of administrative mandate against the California Occupational Safety and Health Appeals Board, naming the Department of Industrial Relations and the Division of Industrial Safety as real parties in interest. Plaintiff sought relief from a penalty imposed upon it by the division and upheld by the appeals board in an administrative proceeding. The penalty was imposed for failure to provide safety devices for employees installing roofing materials on mobilehomes at a height of approximately 12 feet.

I

On September 13, 1977, division compliance safety engineer Donald R. Cunningham visited plaintiff's plant after learning of an industrial accident. As the result of this visit a citation was issued charging 14 violations of safety rules. One alleged violation concerned the failure to provide guardrails for employees in the roof sheeting area and in the mezzanine and storage area. Plaintiff contested only the alleged violation for the failure to provide guardrails at the roof sheeting area.

The matter came on for hearing before an administrative law judge. At the hearing Cunningham testified that on his visit to the plant he observed three workers installing a sheet metal roof at a height of 12 feet without any safety device to prevent falls. Plaintiff did not deny that this situation existed, and in fact admitted that it was so.

Plaintiff's division manager testified regarding the manufacturing process used by plaintiff. As his testimony confirms, we deal with a manufacturing assembly plant. Plaintiff uses an assembly line process consisting of 15 work stations. The units move on a small trolley with an angle iron track. Separately constructed walls are hoisted and nailed to a previously built floor. The roof is then hoisted and nailed to the walls. At the work station where the roof is hoisted to the unit plaintiff has movable scaffolding with guardrails which is hoisted to surround the unit. That station is in compliance with department regulations.

The roofing process consists of setting the roof, electrical wiring, installing plywood sheeting and felt or tar papering, shingling and installation of roof jacks. Plaintiff has two roofing stations with protective scaffolding; however, often a portion of the roofing work is performed between the two stations where there are no protective devices. Thus, after the roof is hoisted and secured the unit is moved to a position without scaffolding where the plywood sheeting and felt or tar paper portion of the work is done. After that is completed the unit is moved to another area with protective scaffolding where the shingling is performed and the roof jacks installed.

Despite the fact that protective scaffolding is available at the point where the roofing is begun and at the point where it is finished, the plywood sheeting and the application of the felt or tar paper is often performed between these two stations without any protective devices. The reason for this is the volume of production at which plaintiff builds

mobile homes. Plaintiff produces four units per day, which leaves only an hour and forty minutes per station. That time is spent hoisting and nailing down the roof at the first station, and is completely used for shingling and installation of roof jacks at the next. To keep the unit at either station where protective scaffolding is available would delay the manufacturing process, so the unit is moved to a point between the two stations for a portion of the roofing work.

The testimony turned from detailing the manufacturing process to the required protection for the workers. When asked what prevented the installation of scaffolding the division manager explained: "Well, as I indicated, now, we have the four scaffolds and catwalks there right now, and our operation was put into operation with a considerable cost. Now, I don't think we're prohibited by anything other than economics, from putting another scaffold there. I don't think that the scaffold in itself interferes with our operation but we just have four right now."

John Best, a consulting engineer, who testified for plaintiff, outlined the types of protective devices which could be used. He described the scaffolding of the type now used as costly and having the potential for interfering somewhat with the production process. The burden of the testimony appears to be that it is the expense which persuaded the plaintiff not to install the required safety devices.

In light of the evidence plaintiff did not deny that it had not provided guardrails for certain employees working on the mobilehome roofs, nor did it contend that it had provided any equivalent safety devices. Instead, plaintiff contended that it should not be required to provide guardrails or equivalent safety devices for those employees. The basis of this contention was plaintiff's belief that it should be subject to the department's construction safety rules, dealing with fixed structures, rather than the general industry safety rules.

The administrative law judge decided the matter contrary to plaintiff's contention and upheld the imposition of the penalty. Plaintiff was to be given a 60-day abatement period so that suitable guarding options could be explored. Plaintiff applied for reconsideration of the decision by the appeals board. The appeals board granted the petition for reconsideration and after reconsideration affirmed the decision of the administrative law judge. The board held that mobilehome manufacturing is governed by the general industry safety orders and not by the

construction safety orders. This proceeding in administrative mandate followed.[1]

## II

### A. *The Difference Between the General Industry Order and the Construction Safety Order*

Plaintiff argues that the general industry safety orders are inapplicable to it and that the division and appeals board thus judged its operation under an erroneous standard. There is no argument that the evidence is insufficient to support the finding that it failed to comply with the general industry safety order set forth at title 8, California Administrative Code, section 3210, subdivision (a).

The applicable general industry safety order provides, "Guardrails shall be provided on all open sides of unenclosed roof openings, open and glazed sides of landings, balconies or porches, platforms, runways, ramps, or working levels more than 30 inches above the floor, ground or other working areas...." (Cal. Admin. Code, tit. 8, § 3210, subd. (a).) The construction safety orders relating to roofing hazards are more lenient, both in terms of the minimum height at which safety devices are required and in the types of devices which may be used. (See Cal. Admin. Code, tit. 8, § 1730.) Plaintiff contends that its employees applying the plywood and felt or tar paper to mobilehome roofs should be considered engaged in roofing operations in the construction industry, for in that manner lesser safety precautions would be required.

---

[1]Pursuant to Labor Code section 6627, any person affected by an order or decision of the appeals board may apply for a writ of mandate in the superior court. The board must certify the administrative record to the superior court and "[n]o new or additional evidence shall be introduced in such court, but the cause shall be heard on the record of the appeals board, as certified to by it." (Lab. Code, § 6628.)

The scope of review in such a proceeding is set forth in Labor Code section 6629, thusly: "The review by the court shall not be extended further than to determine, based upon the entire record which shall be certified by the appeals board, whether: (a) The appeals board acted without or in excess of its powers. [¶] (b) The order or decision was procured by fraud. [¶] (c) The order or decision was unreasonable. [¶] (d) The order or decision was not supported by substantial evidence. [¶] (e) If findings of fact are made, such findings of fact support the order or decision under review. [¶] Nothing in this section shall permit the court to hold a trial de novo, to take evidence, or to exercise its independent judgment on the evidence." Upon such a review: "The findings and conclusions of the appeals board on questions of fact are conclusive and final and are not subject to review. Such questions of fact shall include ultimate facts and the findings and conclusions of the appeals board." (Lab. Code, § 6630.)

The decision of the appeals board involved the interpretation and application of existing regulations. ■ "In reviewing such an agency decision a court must determine whether the administrative agency applied the proper legal standard in evaluating the evidence before it. [Citation.] The interpretation of a regulation, like the interpretation of a statute, is, of course, a question of law [citations], and while an administrative agency's interpretation of its own regulation obviously deserves great weight [citations], the ultimate resolution of such legal questions rests with the courts. [Citations.]" (*Carmona* v. *Division of Industrial Safety* (1975) 13 Cal.3d 303, 310 [118 Cal.Rptr. 473, 530 P.2d 161].)

The regulations of the department are set forth in title 8 of the California Administrative Code. There are a set of general industry safety orders which are applicable to all employments within the state over which the department has jurisdiction, except where specific industry safety orders govern. (Cal. Admin. Code, tit. 8, § 3202, subd. (a).) Where there are specific industry safety orders those orders control in any situation in which they are inconsistent with the general industry safety orders. (*Ibid.*)

The department has promulgated specific industry safety orders for the construction industry. (Cal. Admin. Code, tit. 8, § 1500 et seq.) Those orders provide that at construction projects they take precedence of over general safety orders that are inconsistent with them (with exceptions not relevant here); however machines, equipment, processes, and operations not specifically covered by those orders are governed by the general industry safety orders. (Cal. Admin. Code, tit. 8, § 1502, subds. (b) and (c).)

B. *The General Industry Safety Order Applies*

■ The issue before us is clearly framed: Is plaintiff's operation specifically covered by the construction industry safety orders? If so, then the division and the appeals board erred by applying an erroneous legal standard to plaintiff's conduct. If not, then the general industry safety orders govern plaintiff's conduct and the proper legal standard was applied.

The construction safety orders specify the operations considered to be within the construction industry and thus governed by the construction safety orders as follows: "These orders establish minimum safety stan-

dards wherever employment exists in connection with the construction, alteration, painting, repairing, construction maintenance, renovation, removal, or wrecking of any fixed structure or its parts...." (Cal. Admin. Code, tit. 8, § 1502, subd. (a).) By its decision the appeals board determined that the mobilehome industry does not come within this definition. That decision, as we have noted, is entitled to great weight in our consideration of this issue. (*Carmona* v. *Division of Industrial Safety, supra*, 13 Cal.3d at p. 310.)

In addition to the weight to be given the agency's interpretation of its regulations, plaintiff is faced with a semantic difficulty. "Fixed" and "mobile" have opposite meanings; they are antonyms. (See Webster's New Internat. Dict. (3d ed. 1971) *"Fixed"* at p. 861, *"Mobile"* at p. 1450.) Thus it would seem anomalous for plaintiff to contend that the manufacture of a "mobile" home in an assembly plant is to be equated with the construction of a "fixed" structure.

Plaintiff points at length to all the similarities between mobilehomes and other residential structures in support of its contention that construction safety rules apply to it. To be sure there are similarities; however, there are differences in methods of construction. The construction safety orders apply to the construction of "fixed structures." Such a term connotes a structure fixed in place and built at the site where it is to remain. This connotation is reinforced by California Administrative Code, title 8, section 1502, subdivision (b), which provides that the construction safety rules apply "at construction projects."

Plaintiff's manufacturing process employs an assembly line. Each unit is moved physically from station to station where segments of the work are performed. Each segment of the work on each unit is performed at the same location as every other unit. Thus, the units come to the employees rather than the employees going to the units. When assembled each unit is transported to the location where it will be used, and is capable of being transported again and again. Such a manufacturing process refutes plaintiff's contention that it is engaged in the construction of fixed structures.

After giving deference to the agency's interpretation of its own regulations, and in light of the above discussion, we cannot say that the appeals board or the trial court erred in holding that plaintiff is not governed by the construction safety orders. Plaintiff is thus governed by

the general industry safety orders, and the proper standard was applied to plaintiff's conduct.

## C. *Recent Legislation Does Not Change Our Conclusion*

Plaintiff contends, however, that the Legislature has indicated an intent to treat the mobilehome industry as more closely related to the building industry than to the general manufacturing industry. Plaintiff points to chapter 194 of the Statutes of 1979 (Assem. Bill No. 1517), which amended certain statutory law concerning mobilehomes. The changes wrought by that legislation, and the purposes, were summarized in the Legislative Counsel's Digest. The bill changes the definition of a mobilehome from a "vehicle" to a transportable "structure," and makes certain requirements applicable to trailer coaches applicable to mobilehomes. The bill further permits an owner, and under certain conditions a dealer or manufacturer, to remove the wheels, wheel hubs, or axles from a mobilehome. Finally, the bill precludes any person or entity from either requiring or precluding the owner from removing the wheels, wheel hubs, or axles from a mobilehome.

While we perceive a legislative intent to treat mobilehomes differently than vehicles, we do not perceive in Assembly Bill No. 1517 an intent to equate mobilehomes with fixed structures. Indeed, the bill itself defines mobilehomes as "transportable," and hence not "fixed," structures. We thus reject plaintiff's contention that the enactment of Assembly Bill No. 1517 requires the division or the appeals board to apply the construction safety rules to it.

We cannot agree that various decisions by the federal Occupational Safety and Health Appeals Board require that the decision of the California appeals board herein be reversed. Congress has created a reverse preemptive scheme in its act. Any state that desires to assume responsibility for development and enforcement of occupational safety and health standards may do so, and so long as the state plan is as effective as the federal regulations the federal regulations are without any force or effect within the state. (29 U.S.C. §§ 665, 667(b).) California has so assumed responsibility and federal law is thus inapplicable to the issue herein. Moreover, the decisions of the federal OSHA board cited by plaintiff concern regulations dissimilar to those with which we are concerned and are not persuasive.

The construction safety orders, plaintiff argues, would be sufficient to protect roofing employees in the mobilehome industry. It is not our function to determine which safety standards would be adequate, or even preferable, since that is a matter entrusted to the department. The department has determined that the mobilehome industry is best regulated under general industry standards and has promulgated a regulation which, properly interpreted, so provides. Unless that determination is unreasonable or constitutionally impermissible we must uphold it. We find that determination to be neither unreasonable nor constitutionally impermissible, and thus decline plaintiff's invitation to impose our own views on the department, the division, or the appeals board.

The regulations are not vague. Plaintiff argues that the interpretation of the construction safety regulations which would preclude application of those orders to the mobilehome industry would render the regulations so uncertain and vague as to be unconstitutional in their application. Any contractor that builds a one to three-story building, the argument goes, cannot know whether that building will ever be detached from its foundations and moved and thus cannot know which safety orders apply to it. We believe a contractor that builds a building on the site where it is intended to remain in a manner and with the intention that it will be a fixed structure will be governed by the construction safety rules despite the fact that in some unforeseeable manner the building might at some future time be moved. Conversely, a person that manufactures on an assembly line a movable item with the intention that the item will be removed from the premises before being used will not be governed by the construction safety rules. We find nothing ambiguous or uncertain in the regulations.

## D. *The Administrative Agency's Factual Determination*

We finally address, and reject, plaintiff's contention that the trial court, and ultimately this court, are the "final arbiters" of all factual questions presented. ■ Pursuant to the statutory scheme of the Occupational Safety and Health Act the courts sit only in review of the decisions of the appeals board, and with a limited scope of review. Factual determinations of the appeals board will not be overturned where they are supported by substantial evidence. (Lab. Code, §§ 6629, 6630.) And actions of the department, the division, and the appeals board will not be interfered with where they are not beyond the agency's powers, are not unreasonable, and are not constitutionally impermissible. (Lab. Code, § 6629.) Since we find that the appeals board did not err in inter-

preting the construction safety rules to be inapplicable to the mobilehome industry and further find no barriers to the enforcement of such rules, we must affirm the judgment of the trial court.

The judgment is affirmed.

Paras, Acting P. J., and Evans, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 19, 1981.