[No. S005119. Oct. 31, 1988.]

JOHN F. HENNING, Individually and as Secretary-Treasurer, etc., et al., Petitioners, v.
INDUSTRIAL WELFARE COMMISSION et al., Respondents;
CALIFORNIA RESTAURANT ASSOCIATION et al., Interveners.

COUNSEL

Charles P. Scully II, Donald C. Carroll, Mark Rosenbaum, Kathryn Grannis, Fran Bernstein, Carmen Estrada, Mark Greenberg, Dennis W. Hayashi, John True, Patricia Shiu, Christopher Ho, Shauna Marshall, Patrick O. Patterson, Julius L. Chambers, James M. Nabrit III, John Charles Boger and Jon C. Dugan for Petitioners.

William Genego and Lucy White as Amici Curiae on behalf of Petitioners.

Jan T. Chilton, Donald J. Querio, John H. Feldmann III, Severson, Werson, Berke & Melchior and H. Thomas Cadell, Jr., for Respondents.

Stephen W. Solomon, Ralph B. Saltsman and Solomon, Saltsman & Jamieson as Amici Curiae on behalf of Respondents.

Alan S. Levins, Michele J. Silak, Jeffrey M. Tanenbaum and Littler, Mendelson, Fastiff & Tichy for Interveners.

OPINION

MOSK, J.—We granted review in this proceeding to answer a question that is urgent and of statewide importance: whether Order No. MW-88 of the Industrial Welfare Commission (hereinafter the IWC or Commission), which established, effective July 1, 1988, a so-called "two-tier" minimum wage system containing a lower, "alternative minimum wage" for certain employees who customarily receive tips, is barred by Labor Code section 351 (hereinafter section 351). As we shall explain, we conclude that the question must be answered in the affirmative.

I. THE FACTS

On December 18, 1987, the IWC adopted Order No. MW-88, effective July 1, 1988, raising the minimum wage from $3.35 to $4.25 per hour for employees generally and from $3.35 to $3.50 per hour for employees who customarily receive tips of not less than $60 per month (hereinafter tipped employees).

On January 22, 1988, the IWC adopted its Statement as to the Basis upon which Industrial Welfare Commission Order No. MW-88 Regulating the Minimum Wage, is Predicated (hereinafter the *Statement of Basis for Order No. MW-88*). Although the Commission had formerly construed section

351 to prohibit a lower, "alternative minimum wage" for tipped employees, it now rejected that interpretation: "creating a tipped classification did not violate Labor Code Section 351" (*Statement of Basis for Order No. MW-88, supra*, at p. 11).

On March 23 petitioners initiated this proceeding in mandate in the Court of Appeal against the IWC, the Division of Labor Standards Enforcement, and the Department of Industrial Relations. They contended that the Commission was generally required to establish a single minimum wage for all employees and hence could not set a lower, "alternative minimum wage" for some. They also contended that section 351 barred the "two-tier" minimum wage system at issue here: the Commission had formerly construed section 351 to prohibit a lower, "alternative minimum wage" for tipped employees; in *Industrial Welfare Com.* v. *Superior Court* (1980) 27 Cal.3d 690 [166 Cal.Rptr. 331, 613 P.2d 579] (hereinafter sometimes the *Industrial Welfare Commission* case), this court definitively adopted that construction of the statute as its own; accordingly, section 351 as construed barred the system under review. Petitioners sought a writ of mandate (1) compelling the Commission "to vacate and treat as void so much of its Order MW-88 as purports to fix or allow a different minimum wage for tipped employees" and (2) compelling the Division of Labor Standards Enforcement and the Department of Industrial Relations "to give effect to Order MW-88 for all employees without regard to the purported exception for tipped employees . . . ."

On May 18 the Court of Appeal granted an application to intervene brought by the California Restaurant Association (hereinafter the Restaurant Association) and the California Hotel and Motel Association (hereinafter the Hotel Association).

On June 16 the Court of Appeal filed its decision. It found meritorious the second contention presented by petitioners—viz., section 351 barred the "two-tier" minimum wage system at issue here. Evidently because of its resolution of this claim, it did not address the first—viz., whether the Commission was generally required to establish a single minimum wage for all employees. It ordered that the peremptory writ of mandate sought by petitioners should issue. Pursuant to California Rules of Court, rule 24(d), it declared its decision to be final as to itself forthwith.

On June 21 the IWC submitted a petition for review with requests for expedited consideration and for a stay of the peremptory writ. On June 23 and 24 respectively, the Restaurant and Hotel Associations submitted a stay request and a petition for review with a request for expedited consideration.

On June 24 we denied the stay requests as premature: under *Palma* v. *U.S. Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171, 181 [203 Cal.Rptr. 626, 681 P.2d 893], it is only when the decision of the Court of Appeal becomes final as to this court as well as the Court of Appeal that the peremptory writ actually issues.

On July 1 Order No. MW-88 became effective in accordance with its terms.

On July 27, because of the urgency and importance of the underlying issue, we granted review and ordered expedited consideration.

## II. THE ISSUE

The IWC and the Restaurant and Hotel Associations each make what is in substance the following single contention: the Commission is generally not required to establish a single minimum wage for all employees and hence may set a lower, "alternative minimum wage" for some; moreover, section 351 does not bar the "two-tier" minimum wage system at issue here: as it is currently construed by the Commission, the provision does not prohibit a lower, "alternative minimum wage" for tipped employees; this construction is reasonable and hence should be given effect; it is true the Commission's former construction barred such an "alternative minimum wage," but it is not true this court definitively adopted that construction in the *Industrial Welfare Commission* case.

Before addressing the claim we believe it would be helpful to present a brief summary of the historical background of the IWC's jurisdiction and the established legal principles that govern judicial review of its orders. We also think it is essential to survey in some detail the words and legislative history of section 351 in its current and previous forms. Finally, we believe it would be useful to review the Commission's construction, over the years, of the provision as it now stands.

A. *Background and General Principles of Review*

To describe the historical background of the IWC's jurisdiction and explain the applicable principles of review, we shall begin by quoting from our summary in the *Industrial Welfare Commission* case.

"The IWC is a five-member appointive board initially established by the Legislature in 1913. For the first 60 years of its existence, the IWC's mission was to regulate the wages, hours and conditions of employment of *women and children* employed in this state, in furtherance of such employees'

'health and welfare.' To this end, the commission—beginning in 1916— promulgated a series of industry- and occupation-wide 'wage orders,' prescribing various minimum requirements with respect to wages, hours, and working conditions to protect the health and welfare of women and child laborers. . . .

"In the early 1970s, a number of federal judicial decisions invalidated a substantial portion of the then-prevailing IWC wage orders on the ground that the limited application of such orders to *women* workers (and children) violated the prohibition on sex discrimination embodied in title VII of the federal Civil Rights Act of 1964. [Citations.] In response to these federal decisions, the California Legislature in 1972 and 1973 amended the applicable provisions of the Labor Code to authorize the IWC to establish minimum wages, maximum hours and standard conditions of employment for *all* employees in the state, men as well as women. [Citations.] The constitutionality of this legislative expansion of the IWC's jurisdiction to all California workers is explicitly confirmed by article XIV[,] section 1 of the California Constitution which declares: 'The Legislature may provide for minimum wages and for the general welfare of employees and for those purposes may confer on a commission legislative, executive and judicial powers.'

"Although the 1973 modification of the IWC's jurisdiction to encompass men as well as women and minors clearly worked a substantial expansion in the number of workers affected by the commission's orders, . . . the 1973 legislation did not alter the basic nature of the IWC's decision-making authority or the basic principles governing judicial review of the commission's exercise of that authority. From its inception in 1913 to the present, the commission has been vested with broad statutory authority to investigate 'the comfort, health, safety, and welfare' of the California employees under its aegis [citation] and to establish (1) '[a] minimum wage . . . which shall not be less than a wage adequate to supply . . . the necessary cost of proper living and to maintain the health and welfare of such [employees],' (2) '[t]he maximum hours of work consistent with the health and welfare of [such employees]' and (3) '[t]he standard conditions of labor demanded by the health and welfare of [such employees] . . . [.]' [Citation.]

"Indeed, the 1973 act—while retaining the authorizing language . . . quoted above—restated the commission's responsibility in even broader terms, directing the commission continually to review and to update its 'rules, regulations and policies to the extent found by the commission to be necessary to provide *adequate and reasonable wages, hours, and working conditions appropriate for all employees in the modern society.*' (Italics added.) [Citation.]

■ "Judicial authorities have repeatedly emphasized that in fulfilling its broad statutory mandate, the IWC engages in a quasi-legislative endeavor, a task which necessarily and properly requires the commission's exercise of a considerable degree of policy-making judgment and discretion. [Citations.]

"Because of the quasi-legislative nature of the IWC's authority, the judiciary has recognized that its review of the commission's wage orders is properly circumscribed. . . . 'A reviewing court does not superimpose its own policy judgment upon a quasi-legislative agency in the absence of an arbitrary decision; rather, the review is limited to an examination of the proceedings to determine whether the action is arbitrary or entirely lacking in evidentiary support or whether the agency has violated the procedure required by law; in these technical matters requiring the assistance of experts and the collection and study of statistical data, courts let administrative boards and officers work out their problems with as little judicial interference as possible.' . . .

■ "Moreover, past decisions additionally teach that in light of the remedial nature of the legislative enactments authorizing the regulation of wages, hours and working conditions for the protection and benefit of employees, the statutory provisions are to be liberally construed with an eye to promoting such protection. . . . 'Remedial statutes such as those under consideration [i.e., the statutes governing the adoption of wage orders] are to be liberally construed. [Citation.] They are not construed within narrow limits of the letter of the law, but rather are to be given liberal effect to promote the general object sought to be accomplished. . . . [¶] Regulations and orders of the Industrial Welfare Commission are presumed to be *reasonable and lawful*.' (Italics in original.)" (*Industrial Welfare Com.* v. *Superior Court, supra,* 27 Cal.3d at pp. 700-703, fn. omitted.)

■ Further, it must be emphasized "that 'the construction of a statute by officials charged with its administration . . . is entitled to great weight' . . . ." (*Industrial Welfare Com.* v. *Superior Court, supra,* 27 Cal.3d at p. 724.) Indeed, if a court concludes that the administrative construction is reasonable, it will generally defer to the agency's judgment and uphold its interpretation against challenge. (See *id.* at pp. 729-730; *Merrill* v. *Department of Motor Vehicles* (1969) 71 Cal.2d 907, 917, fn. 15 [80 Cal.Rptr. 89, 458 P.2d 33]; *Bodinson Mfg. Co.* v. *California E. Com.* (1941) 17 Cal.2d 321, 325 [109 P.2d 935].)

■ In the general case, of course, an administrative agency may change its interpretation of a statute, rejecting an old construction and adopting a new. (*NLRB* v. *Iron Workers* (1978) 434 U.S. 335, 351 [54 L.Ed.2d 586, 599, 98 S.Ct. 651]; *Placentia-Linda Community Hosp., Inc.* v. *Zaretsky*

(1980) 107 Cal.App.3d 850, 854 [166 Cal.Rptr. 7].) Put simply, "An administrative agency is not disqualified from changing its mind . . . ." (*NLRB v. Iron Workers, supra,* 434 U.S. at p. 351 [54 L.Ed.2d at p. 599].)

Even when an agency adopts a new interpretation of a statute and rejects an old, a court must continue to apply a deferential standard of review: "When [the agency] does [change its mind], the courts still sit in review of the administrative decision and should not approach the statutory construction issue *de novo* and without regard to the administrative understanding of the statutes." (*NLRB v. Iron Workers, supra,* 434 U.S. at p. 351 [54 L.Ed.2d at p. 599].)

To the rule stated above, however, there is an exception: an administrative agency is precluded from changing its mind when the construction that it would reject has been definitively adopted by a court as its own. (See *Crounse Corp. v. I.C.C.* (6th Cir. 1986) 781 F.2d 1176, 1186 [implying that an administrative agency is bound by its prior construction if that construction has been endorsed by the courts]; *Royal Development Co., Ltd. v. N.L.R.B.* (9th Cir. 1983) 703 F.2d 363, 369 [to similar effect].) The reason for the exception seems clear: "The ultimate interpretation of a statute is an exercise of the judicial power." (*Bodinson Mfg. Co. v. California E. Com., supra,* 17 Cal.2d at p. 326; accord, *Merrill v. Department of Motor Vehicles, supra,* 71 Cal.2d at p. 917, fn. 15.)

B. *The Words and Legislative History of Section 351 in Its Current and Previous Forms*

In 1917 the Legislature enacted the statute that is evidently the ultimate source of section 351. The provision declared in relevant part: "Any employer or agent or representative of an employer . . . who shall demand or receive directly or indirectly from any person then in the employment of said employer, any fee, gift or other remuneration or consideration, or any part or portion of any tips or gratuities received by such employee while in the employment of said employer, in consideration or as a condition of such employment or hiring or employing any person to perform such services for such employer or of permitting said person to continue in such employment, is guilty of a misdemeanor . . . ." (Stats. 1917, ch. 172, § 1, p. 257.)

In *In re Farb* (1918) 178 Cal. 592 [174 P. 320, 3 A.L.R. 301], this court struck down the 1917 statute as violative of principles of "substantive due process," specifically "freedom of contract." In the course of its opinion, the court rejected an argument that the provision was designed as a measure to protect the public from fraud regarding the ultimate disposition of tips and was therefore constitutional: "If we concede the correctness of th[e]

contention [that the provision was intended to prevent fraud], for the purposes of discussion, still we must declare the statute void as seeking to overcome by prohibition of any contract between employer and employee, a deception which would instantly disappear if the former were required to post in his place of business a notice of the terms of the contract whereby he was to have the benefit of gratuities. . . . The law does not tolerate the prohibition of something which may be regulated in such way as to overcome any evils which may be incidentally connected with it." (*Id*. at p. 598.)

In 1929 the Legislature enacted a statute (hereinafter the 1929 statute) in evident response to *In re Farb*. The relevant provisions were as follows.

"SEC. 2. Every employer, or agent of any employer, who collects, takes or receives any tips or gratuities, or a part thereof, paid or given to or left for his employees by patrons, or who deducts any amount from wages due his employees on account of such tips or gratuities, or who requires his employees to credit the amount, or any part thereof, of such tips or gratuities received by them against and as a part of the wages due such employees from said employer, shall post and keep posted in a conspicuous place . . . a notice or notices [explaining the disposition of tips] . . . .

". . . . . . . . . . . . . . . . . . . . .

"Such notice shall also state the extent to which the employees are required by such employer to accept such tips or gratuities in lieu of wages or the extent to which the employee is required to accept and credit such tips and gratuities against wages due such employees.

". . . . . . . . . . . . . . . . . . . . .

"SEC. 5. . . . The Legislature . . . expressly declares that the purpose of this act is to prevent fraud upon the public in connection with the practice of tipping and declares this a law passed for a public reason which can not be contravened by a private agreement and as a part of the social public policy of this state, binding upon all departments of the state government." (Stats. 1929, ch. 891, §§ 2, 5, pp. 1972-1973.)

In 1937 the Legislature codified the relevant provisions of the 1929 statute in modified form as sections 351, 352, and 356 of the Labor Code.

In its original form section 351 declared in relevant part as follows. "Every employer or agent who collects, takes, or receives any gratuity, or a part thereof, paid, given to, or left for an employee by a patron, or who deducts any amount from wages due an employee on account of such

gratuity, or who requires an employee to credit the amount, or any part thereof, of such gratuity against and as a part of the wages due the employee from the employer, shall keep posted in a conspicuous place . . . a notice [explaining the disposition of tips] . . . ." (Stats. 1937, ch. 90, § 351, p. 203.)

In its original form section 352 declared: "The notice shall also state the extent to which the employees are required by the employer to accept gratuities in lieu of wages or the extent to which the employee is required to accept and credit gratuities against wages." (Stats. 1937, ch. 90, § 352, p. 203.)

Finally, section 356 stated—and continues to state: "The Legislature expressly declares that the purpose of this article [viz., article I (Gratuities) of chapter 3 (Privileges and Prerequisites) of the Labor Code, i.e., sections 350 to 356] is to prevent fraud upon the public in connection with the practice of tipping and declares that this article is passed for a public reason and can not be contravened by a private agreement. As a part of the social public policy of this State, this article is binding upon all departments of the State." (Stats. 1937, ch. 90, § 356, p. 203.)

In 1965 the Legislature amended sections 351 and 352. As amended, section 351 stated as follows: "No employer or agent shall collect, take, or receive any gratuity, or a part thereof, paid, given to, or left for an employee by a patron, or deduct any amount from wages due an employee on account of such gratuity, or require an employee to credit the amount, or any part thereof, of such gratuity against and as a part of the wages due the employee from the employer, unless he posts in a conspicuous place . . . a notice [explaining the disposition of tips] . . . ." (Stats. 1965, ch. 686, § 1, pp. 2062-2063.)

As amended, section 352 declared: "The notice required by Section 351 shall also state the extent to which the employees are required by the employer to accept gratuities in lieu of wages or the extent to which the employee is required to accept and credit gratuities against wages." (Stats. 1965, ch. 686, § 2, p. 2063.)

In 1968 the IWC adopted Wage Order No. 5-68, which established a so-called "tip credit" system: "Amounts may be credited as part of the minimum wage for gratuities received by any [covered employee] engaged in an occupation in which the employee customarily and regularly receives more than twenty dollars ($20) per month in gratuities. The credited amount shall in no case exceed twenty cents (20¢) per hour." This provision was

codified at subdivision 4(c) of section 11380 of title 8 of the California Administrative Code (now Cal. Code Regs.).

In 1972 Assemblyman Leroy F. Greene introduced Assembly Bill No. 78, 1972 Regular Session (hereinafter A.B. 78) (1 Assem. J. (1972 Reg. Sess.) p. 120) in an attempt to amend section 351. The bill—which was virtually identical in relevant part to the provision as it now stands—would have deleted the "notice" exception and would have added the following provision: "Every . . . gratuity is hereby declared to be the sole property of the employee to whom it was paid, given, or left for [*sic*]."

The opinion of the Legislative Counsel on the effect of A.B. 78 was in relevant part as follows. "A.B. 78, as introduced, would delete provisions of law that now, broadly speaking, enable employers to obtain the benefit (as, in effect, the payment of wages) of tips and other gratuities received by their employees, and thereby prohibit an employer from receiving such a benefit." (Ops. Cal. Legis. Counsel on Assem. Bill No. 78 (1972 Reg. Sess.) (Feb. 29, 1972) p. 1 [hereinafter Ops. Cal. Legis. Counsel on A.B. 78].) It also stated: "Pursuant to its authority the Industrial Welfare Commission has promulgated subdivision 4(c) of Section 11380 of Title 8 of the California Administrative Code. Subdivision 4(c) of Section 11380 provides [for a 'tip credit' system.] . . . [¶] This subdivision, in authorizing the crediting of tips or gratuities against the minimum wage of [covered employees] would be in conflict with the provisions of A.B. 78, as introduced, if A.B. 78, as introduced, should be enacted, since the bill in that form would prohibit any such crediting. Consequently, in view of the preceding, we think that if the bill in that form is enacted into law, subdivision 4(c) of Section 11380 of Title 8 of the Administrative Code would be invalid." (*Id.* at pp. 2-3.)

As 1972 was drawing to a close, however, the attempt to amend section 351 proved unsuccessful: A.B. 78 "died" in the Senate Committee on Industrial Relations. (Assem. Final Hist. (1972 Reg. Sess.) p. 83.)

In 1973 Assemblyman Greene introduced Assembly Bill No. 10, 1973-1974 Regular Session (hereinafter A.B. 10) (1 Assem. J. (1973-1974 Reg. Sess.) p. 17)—which was identical in relevant part to A.B. 78 as introduced—in another attempt to amend section 351.

In a memorandum by the Assembly Committee on Labor Relations it is stated: "AB 10 prohibits an employer from taking any tip given by a patron to his employee and prohibits an employer from requiring that such tip be credited against wages. This eliminates the present practice whereby employers can credit tips up to 20 cents per hour of the minimum wage." (Assem. Com. on Labor Relations, Mem. on Assem. Bill No. 10 (1973-1974

Reg. Sess.) for Apr. 4, 1973, Hg., p. 1 [hereinafter Assem. Com. on Labor Relations, Mem. on A.B. 10].) It further states: "Present law also requires that a notice be posted when tips are being credited against wages. AB 10 eliminates that requirement." (*Ibid.*)

This attempt to amend section 351 proved to be partially successful: the Legislature retained the provision declaring tips to be the employee's property, but added a provision to preserve the validity of the "tip credit" system established by Wage Order No. 5-68.

As amended, section 351 stated in relevant part as follows. "No employer or agent shall collect, take, or receive any gratuity or a part thereof, paid, given to or left for an employee by a patron, or deduct any amount from wages due an employee on account of such gratuity, or require an employee to credit the amount, or any part thereof, of such gratuity against and as a part of the wages due the employee from the employer, *except to the extent that may be permitted by a valid regulation of the California Division of Industrial Welfare,* and further provided he posts in a conspicuous place . . . a notice . . . stating the extent to which the employees are required by the employer to accept gratuities in lieu of wages or the extent to which the employee is required to accept and credit gratuities against wages. *Every such gratuity is hereby declared to be the sole property of the employee or employees to whom it was paid, given, or left for* [*sic*]." Stats. 1973, ch. 879, § 1, pp. 1610-1611, italics added.) As it amended section 351 into a form that included the substance of section 352, the Legislature repealed section 352 as a separate provision. (Stats. 1973, ch. 879, § 2, p. 1611.)

In 1974 the Legislature amended section 351 by substituting the words "Industrial Welfare Commission" for the words "California Division of Industrial Welfare." (Stats. 1974, ch. 552, § 1, p. 1375.)

Late in that same year Assemblyman Greene introduced Assembly Bill No. 232, 1975-1976 Regular Session (hereinafter A.B. 232) (1 Assem. J. (1975-1976 Reg. Sess.) p. 138), in a final attempt to amend section 351 to reflect the policy he previously urged.

The Legislative Counsel's Digest of A.B. 232 declares: "The existing law prohibits an employer from receiving or deducting from employee wages any part of a gratuity given to or left for an employee by a patron, except to the extent permitted by regulations of the Industrial Welfare Commission, *provided that a notice is conspicuously placed in the place of business stating the extent to which the employee is required to credit gratuities against wages.* [¶] This bill would eliminate the authority of the Industrial Welfare Commission to permit an employer to receive or deduct from

employee wages any part of a gratuity given to or left for an employee by a patron." (Legis. Counsel's Dig., Assem. Bill No. 232 (1975-1976 Reg. Sess.), as introduced.)

In a memorandum by the Senate Committee on Industrial Relations it is stated that the purpose of A.B. 232 is "To eliminate the authority of the Industrial Welfare Commission to permit employers to credit tips against the wages of employees." (Sen. Com. on Ind. Relations, Mem. on Assem. Bill No. 232 (1975-1976 Reg. Sess.) (May 19, 1975) p. 1 [hereinafter Sen. Com. on Ind. Relations, Mem. on A.B. 232].) In the memorandum it is also stated that the bill "would eliminate the authority of the Industrial Welfare Commission to permit tips to be credited against the wages of employees. The effect of this bill would be to require employers to pay employees at least the minimum wage regardless of the amount of tips the employees receive." (*Ibid.*)

Similarly, in a memorandum by the Assembly Committee on Labor Relations it is stated that A.B. 232 "would repeal the authority of the Industrial Welfare Commission to permit an employer to deduct tips from wages, and thus, would prohibit the consideration of tips as wages. The basis for this legislation would appear to be that tips or gratuities are given for individual excellence of service above and beyond the basic duties of the employment, and as such, the employer has no vested right to consider tips a part of wages." (Assem. Com. on Labor Relations, Mem. on Assem. Bill No. 232 (1975-1976 Reg. Sess.) p. 1.)

This time, the attempt to amend section 351 proved totally successful: in 1975 the Legislature amended this provision into its current form by deleting the exception introduced at the end of the first sentence in 1974, thereby revoking the authority of the IWC to allow an employer to obtain the benefit of tips received by his employees. Thus, as it now stands section 351 provides in relevant part as follows. "No employer or agent shall collect, take or receive any gratuity or a part thereof, paid, given to or left for an employee by a patron, or deduct any amount from wages due an employee on account of such gratuity, or require an employee to credit the amount, or any part thereof, of such gratuity against and as a part of the wages due the employee from the employer. Every such gratuity is hereby declared to be the sole property of the employee or employees to whom it was paid, given, or left for [*sic*]."

C.   *Construction of Section 351 by the IWC*

After the Legislature amended section 351 into its current form in 1975, the IWC consistently construed the provision to bar the establishment of a

minimum wage for tipped employees lower than the generally applicable minimum wage. For example, in 1976 the Commission reviewed the adequacy of the minimum wage and declared: "Many requests were received from the hotel and restaurant industry for a special, lower wage rate for tipped employees. . . . The Commission denied the request . . . . [T]he Legislature specifically revoked the authority it had earlier given the I.W.C. to allow credit for tips against the minimum wage, when it amended Section 351 of the Labor Code this [*sic*] year." (Statement of Findings by the Cal. Ind. Welf. Com. in Connection with the Revision in 1976 of its Orders Regulating Wages, Hours, and Working Conditions, p. 11.)

In 1979 the IWC again reviewed the adequacy of the minimum wage. The Restaurant and Hotel Associations urged the Commission to "establish a lower cash minimum wage" for tipped employees. (Statement of Position of Cal. Restaurant Assn. and Cal. Hotel and Motel Assn. to Cal. Ind. Welf. Com. in the [M]atter of Proposal for Hours, Wages and Working Conditions Order for the Pub. Housekeeping Industry (Aug. 21, 1979) p. 19.) The Commission denied the request: "the Legislature specifically revoked the authority it had earlier given the IWC to allow credit for tips against the minimum wage, when it amended Section 351 of the Labor Code [in 1975]." (Statement as to the Basis for Ind. Welf. Com. Order No. 5-76 Regulating Wages, Hours, and Working Conditions in the Pub. Housekeeping Industry (as adopted Nov. 16, 1979) p. 20.)

In 1980 the IWC argued before this court in the *Industrial Welfare Commission* case that section 351 barred a lower minimum wage for tipped employees: "Not only is the tip the sole property of the employee but also it may *not* be deducted or used as a credit against the wages due the employee. An employer may not pay an employee less than the minimum wage and then use the tips received by the employee to make up the difference. The Legislature could not have intended to allow indirectly what it forbade directly. The adoption of a lower minimum wage for a tipped employee has the effect of doing just that. A lower minimum (which in itself is to provide an adequate) wage is only possible because tips are used to subsidize it. Thus, an employer, who is allowed to pay a lower minimum wage to those who receive tips, is indirectly deducting from wages those same tips—a practice squarely prohibited by Labor Code section 351." (Replication of Ind. Welf. Com. and Div. of Lab. Stds. Enforcement, etc.; Points and Authorities in Support Thereof, pp. 89-90, italics in original.)

In 1982 the IWC convened a Minimum Wage Board to review the adequacy of the minimum wage. The board considered and rejected a proposal

for a lower minimum wage for tipped workers. (Rep. of 1982 Min. Wage Bd., "Minutes," pp. 16-17.)

In 1984 the IWC convened another Minimum Wage Board to review the adequacy of the minimum wage. This board too considered and rejected a proposal for a lower, so-called "alternative minimum wage" for tipped workers. (Rep. of 1984 Min. Wage Bd., "Minutes," pp. 64-67.)

But late in 1987, as stated above, the IWC established a lower, "alternative minimum wage" for tipped employees, rejecting its former construction of section 351 and adopting the contradictory interpretation in its place: "creating a tipped classification did not violate Labor Code Section 351" (*Statement of Basis for Order No. MW-88, supra,* at p. 11).

D. *Discussion of the Claim Before the Court*

As stated above, the IWC and the Restaurant and Hotel Associations each make what is in substance a single claim: the Commission is generally not required to establish a single minimum wage for all employees and hence may set a lower, "alternative minimum wage" for some; moreover, section 351 does not bar the "two-tier" minimum wage system at issue here: as it is currently construed by the Commission, the provision does not prohibit a lower, "alternative minimum wage" for tipped employees; this construction is reasonable and hence should be given effect; it is true the Commission's former construction barred such an "alternative minimum wage," but it is not true this court definitively adopted that construction in the *Industrial Welfare Commission* case.

■ We agree that the IWC is generally not required to fix a single minimum wage for all employees. In article XIV, section 1 of the California Constitution, the people have given the Legislature broad power in this area: "The Legislature may provide for minimum wages and for the general welfare of employees and for those purposes may confer on a commission legislative, executive, and judicial powers." (Italic added.) In Labor Code sections 1173 and 1178 and following, the Legislature in turn has delegated its power in this regard to the Commission. In view of the foregoing, we would be reluctant to recognize a "single-minimum-wage" requirement limiting the Commission's authority unless the Constitution or the code at least implied such a requirement with reasonable clarity. They do no such thing. Hence, we conclude that the Commission is not subject to such a requirement.

We cannot agree, however, that section 351 does not bar the "two-tier" minimum wage system at issue here. Our reasoning is as follows.

We recognize that in *Industrial Welfare Com.* v. *Superior Court, supra,* 27 Cal.3d 690, we did not definitively adopt as our own the IWC's former construction of the statute barring a lower minimum wage for tipped employees, but simply concluded that such an interpretation was reasonable. (*Id.* at pp. 729-730.) On this point the Court of Appeal was in error.

■ We also recognize that in the abstract, a current administrative interpretation would ordinarily be entitled to great weight. (See *Industrial Welfare Com.* v. *Superior Court, supra,* 27 Cal.3d at p. 724.) But when as here the construction in question is not "a contemporaneous interpretation" of the relevant statute and in fact "flatly contradicts the position which the agency had enunciated at an earlier date, closer to the enactment of the . . . statute[,]" it cannot command significant deference. (*General Electric Co.* v. *Gilbert* (1976) 429 U.S. 125, 142 [50 L.Ed.2d 343, 358, 97 S.Ct. 401].)

■ Having considered the matter closely and accorded the IWC the fullest deference justified by the facts and consistent with our obligation to declare the meaning of the law, we believe that section 351 must be construed to bar the "two-tier" minimum wage system at issue here and hence that the Commission's current interpretation of the provision is unreasonable.

As we read the words and legislative history of section 351 in its current and previous forms, we discern the legislative intent underlying the provision as it now stands to be as follows. Broadly, the Legislature has declared that tips belong to the employee and the IWC may not permit an employer to obtain the benefit of such tips by paying a tipped employee a wage lower than he would be obligated to pay if the employee did not receive tips. More narrowly, it has declared that the IWC may not permit an employer to use a "tip credit" to pay a tipped employee a wage lower than the minimum wage he would be obligated to pay if the employee did not receive tips.

Our reading of the legislative intent is grounded in the words of A.B. 78—the ultimate source of section 351 in its current form—and its legislative history. As stated by the Legislative Counsel: "A.B. 78 . . . would delete provisions of law that now, broadly speaking, enable employers to obtain the benefit (as, in effect, the payment of wages) of tips and other gratuities received by their employees, and thereby prohibit an employer from receiving such a benefit," and would invalidate the IWC's regulations "authorizing the crediting of tips or gratuities against the minimum wage . . . ." (Ops. Cal. Legis. Counsel on A.B. 78, *supra,* at pp. 1, 3.)

Our reading receives further support from A.B. 10: "AB 10 prohibits an employer from taking any tip given by a patron to his employee and prohib-

its an employer from requiring that such tip be credited against wages." (Assem. Com. on Labor Relations, Mem. on A.B. 10, *supra*, at p. 1.)

Finally, our reading is confirmed by A.B. 232, the immediate source of section 351 in its current form: The bill was intended "To eliminate the authority of the Industrial Welfare Commission to permit employers to credit tips against the wages of employees" and thereby "to require employers to pay employees at least the minimum wage regardless of the amount of tips the employees receive." (Sen. Com. on Ind. Relations, Mem. on A.B. 232, *supra*, at p. 1.)

Scrutinized in light of the legislative intent underlying section 351 in its current form, the IWC's construction of the provision to permit the "two-tier" minimum wage system at issue here is unreasonable. As stated above, the Legislature has broadly declared that the Commission may not permit an employer to obtain the benefit of his employee's tips by paying the employee a wage lower than he would be obligated to pay if the employee did not receive tips. But in establishing the system under review, the Commission has attempted to do the very thing the Legislature has prohibited: under this system, the Commission clearly purports to allow an employer to pay a tipped employee a wage lower than he would be obligated to pay if the employee did not receive tips.

As also stated above, the Legislature declared more narrowly that the IWC may not permit an employer to use a "tip credit" to pay a tipped employee a wage lower than the minimum wage he would be obligated to pay if the employee did not receive tips. Although in form they may be different, in function the "tip credit" and the "alternative minimum wage" are identical. The IWC itself candidly admits as much in its opening brief: "To be sure, the alternative minimum wage, like a tip credit, does result in less total income for tipped employees." Considering the words and legislative history of section 351 in its current and previous forms, we believe that the Legislature impliedly declared that the Commission may not permit an employer to use an "alternative minimum wage" to pay a tipped employee a wage lower than the minimum wage he would be obligated to pay if the employee did not receive tips. We might have come to a different result if the words and legislative history of the provision revealed an intent on the part of the Legislature to prohibit only the "tip credit" and not its effect, i.e., lower income for tipped employees. The provision's words and history, however, reveal no such intent.

Against our conclusion that section 351 in its current form bars the "two-tier" minimum wage system at issue here, the IWC and the Restaurant and Hotel Associations present two broad arguments.

The first is that section 351 does not expressly bar the system under review: by its terms, the provision speaks only of employers and wages due tipped employees, and does not concern the Commission or the scope of its power to fix minimum wages. We agree. Our analysis, however, is not premised in any part whatever on the existence of an express statutory prohibition.

The second argument is that section 351 does not impliedly bar the "two-tier" minimum wage system at issue here. It is claimed that the sole purpose of the provision is definitively declared in section 356 to be the "prevent[ion of] fraud upon the public in connection with the practice of tipping" and that that purpose is not frustrated by the system under review. The point is without merit. As the analysis presented above reveals, the prevention of fraud cannot be deemed the sole purpose of section 351 *in its current form*: the provision was broadly intended to bar the IWC from permitting an employer to pay a tipped employee a wage lower than he would be obligated to pay if the employee did not receive tips; and it was more narrowly intended to bar the Commission from permitting an employer to use a "tip credit" to pay a tipped employee a wage lower than the minimum wage he would be obligated to pay if the employee did not receive tips. We do not disregard the Legislature's declaration of purpose in section 356. But we cannot consider it "definitive": the declaration was enacted in 1929 and was codified in 1937, when section 351 was simply a "notice" statute; it has remained unchanged since 1937, but in the meantime section 351 has been radically amended into a statute establishing substantive public policy without any "notice" requirement whatever.

It is also claimed that neither the words nor the legislative history of the provision in its current or previous forms reveals any intent on the part of the Legislature to affect the scope of the Commission's power to fix minimum wages or specifically to bar it from establishing a lower, "alternative minimum wage" for tipped employees. But as the analysis presented above shows, this point too is without merit: the intent, albeit implied, is clear.

Therefore, we conclude that the Court of Appeal—although misconstruing the effect of the *Industrial Welfare Commission* case—correctly decided that section 351 barred the "two-tier" minimum wage system at issue here. We also conclude that the court correctly ordered the relief sought, i.e., the establishment of a single minimum wage of $4.25 per hour for all employees without exception.[1]

---

[1] In this court the Restaurant and Hotel Associations attempt to raise for the first time a claim to the effect that the invalidation of the lower, "alternative minimum wage" for tipped employees should result not in affirmance of the judgment of the Court of Appeal, but in reversal or vacation of that judgment with directions that the court remand the matter to the

The judgment of the Court of Appeal is affirmed.

Lucas, C. J., Panelli, J., Eagleson, J., and Kaufman, J., concurred.

**BROUSSARD, J.**—I concur in our holding; Labor Code section 351 deprives the Industrial Welfare Commission of authority to establish a two-tier minimum wage system with a lower minimum wage for employees who receive tips. However, we have decided that identical issue before. In 1980, we examined the legislative history of Labor Code section 351, and indorsed the Industrial Welfare Commission's conclusion that the section would not permit a two-tier wage system with a lower minimum wage for tipped employees. (*Industrial Welfare Com.* v. *Superior Court* (1980) 27 Cal.3d 690, 729-731 [166 Cal.Rptr. 331, 613 P.2d 579].) That decision constituted a judicial interpretation of the statute, and deprived the Industrial Welfare Commission of any authority to interpret the statute in a way which is inconsistent with our 1980 decision. The Court of Appeal was right in this case when it said: "We need not construe section 351, as that judicial function has been performed by the California Supreme Court."

In 1975 the Legislature amended section 351. The same year, the Industrial Welfare Commission rejected the request of employers that it establish a lower minimum wage for tipped employees. The commission interpreted the amended statute as depriving it of authority to establish a lower minimum wage for tipped employees. (*Industrial Welfare Com.* v. *Superior Court, supra,* 27 Cal.3d at p. 729.) The commission stated: " 'First, and most

IWC to give it an opportunity to determine a single minimum wage for all employees. We reject the point. To begin with, the claim is too late. (Cal. Rules of Court, rule 29(b)(1).) In any event, it is without merit. Order No. MW-88 contains an express "separability" clause: "If the application of any provision of this Order, or any section, subsection, subdivision, sentence, clause, phrase, word or portion of this Order should be held invalid or unconstitutional or unauthorized or prohibited by statute, the remaining provisions thereof shall not be affected thereby, but shall continue to be given full force and effect as if the part so held invalid or unconstitutional had not been included herein." The Commission explicated the clause thus: "The IWC intends that MW-88 be fully effective and enforceable. Should any part of MW-88 be declared invalid, the IWC intends, by this provision, that the part found invalid be severed from the order and thus maximize the protections for employees." (*Statement of Basis for Order No. MW-88, supra,* at p. 13.) In our view, the Commission has declared in effect that the single minimum wage for all employees—if a single minimum wage there must be—should be $4.25 per hour. Significantly, the Commission makes no complaint about the propriety of the relief granted. Consequently, we conclude that remand is unnecessary.

In its brief on the merits, the Division of Labor Standards Enforcement "seek[s] guidance from the Court . . . . In the event the Court . . . sustain[s] the Court of Appeal, the Division requests that the Court address the issue of the [*sic*] whether the ruling of the Court would be prospective only or retroactive to July 1, 1988, the effective date of the Industrial Welfare Commission's Order MW-88." As the IWC and the Restaurant and Hotel Associations have impliedly conceded, "retroactivity" is called for here: the lower, "alternative minimum wage" for tipped employees was void *ab initio.*

important, the Legislature specifically revoked the authority it had earlier given the IWC to allow credit for tips against the minimum wage, when it amended section 351 of the Labor Code this year.[]' " (*Ibid.*)

The employers challenged this conclusion, arguing before this court that the commission had misinterpreted the amended statute. While the amendment may have been intended to prohibit the commission from allowing employers to deduct tips from wages directly, they argued, nothing in the amendment prohibited the indirect approach of allowing the commission to establish a lower minimum wage for tipped employees.

We agreed with the commission. We said: "[W]e think that the legislative history of the 1975 bill supports the IWC's conclusion that the Legislature contemplated that the enactment would insure that tips received by an employee would not reduce an employer's minimum wage obligation, either directly or indirectly." (*Industrial Welfare Com.* v. *Superior Court, supra,* 27 Cal.3d at p. 730.) We turned to legislative committee reports to demonstrate that the Legislature intended the bill to assure that the employer would receive no benefit, even indirectly, from the employee's tips. We concluded: "In light of the legislative history, the IWC could reasonably interpret the amendment of section 351 as a legislative determination that all employees should be guaranteed a minimum wage that is not reduced by virtue of any tips an employee may possibly receive." (*Ibid.*)

Although we spoke of the "reasonableness" of the commission's interpretation, and noted our duty to give the commission's interpretation great weight, we did more than simply defer to the commission. Our examination of the legislative history of the 1975 amendments, and our statement about the intent of the Legislature, made it clear that we were exercising the judicial function of interpreting the statute and reaching a conclusion as to its true meaning. Our analysis of the statutory history showed that the commission's interpretation was the correct interpretation of the statute. This was an exercise of judicial power which it was beyond the authority of the commission to disregard at a later date.

It is our obligation, when presented with a question of statutory interpretation, to determine the true meaning of the statute. (*Bodinson Mfg. Co.* v. *California E. Com.* (1941) 17 Cal.2d 321, 325-326 [109 P.2d 935]; see also *Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1389 [241 Cal.Rptr. 67, 743 P.2d 1323]; *Merrill* v. *Department of Motor Vehicles* (1969) 71 Cal.2d 907, 917 [80 Cal.Rptr. 89, 458 P.2d 33].) We should not overstate the deference which we owe to administrative

interpretations of statutes.[1] It is true that an administrative agency may interpret the statutes it is charged with implementing, and that this construction is entitled to great weight. (*Bodinson Mfg. Co.* v. *California E. Com., supra,* 17 Cal.2d 321, 325-326; see also *Banning Teachers Assn.* v. *Public Employment Relations Bd.* (1988) 44 Cal.3d 799, 804 [244 Cal.Rptr. 671, 750 P.2d 313].) Nonetheless, the administrative interpretation is not binding on this court. (See *Perdue* v. *Crocker National Bank* (1985) 38 Cal.3d 913, 935-936 [216 Cal.Rptr. 345, 702 P.2d 503]; *Carmona* v. *Division of Industrial Safety* (1975) 13 Cal.3d 303, 310 [118 Cal.Rptr. 473, 530 P.2d 161]; *Skyline Homes, Inc.* v. *Occupational Safety & Health Appeals Bd.* (1981) 120 Cal.App.3d 663, 669 [174 Cal.Rptr. 665].) "[I]t is the duty of this court, when such a question of law is properly presented, to state the true meaning of the statute finally and conclusively. . . . [Citations.] The ultimate interpretation of a statute is an exercise of the judicial power. [Citations.]" (*Bodinson Mfg. Co.* v. *California E. Com., supra,* 17 Cal.3d at p. 326; see also *Dyna-Med, Inc.* v. *Fair Employment & Housing Com., supra,* 43 Cal.3d 1379, 1389; *Merrill* v. *Department of Motor Vehicles, supra,* 71 Cal.2d 907, 917, fn. 15.) Once this court has indorsed a particular interpretation of a statute, an administrative agency lacks authority to interpret the statute differently. (See *Crounse Corp.* v. *I.C.C.* (6th Cir. 1986) 781 F.2d 1176, 1186, cert. den. 479 U.S. 890 [93 L.Ed.2d 264, 107 S.Ct. 290].)

In conclusion, we exercised the judicial function of interpreting Labor Code section 351 when we decided *Industrial Welfare Com.* v. *Superior Court* in 1980. When the issue was raised again the commission was required to follow our ruling and to refuse to impose a two-tier system with a lower minimum wage for tipped employees. The commission could have asked us to reconsider our 1980 decision. The commission could have sought a change in the law from the Legislature (see e.g., *Dyna-Med, Inc.* v. *Fair Employment & Housing Com., supra,* 43 Cal.3d at p. 1393). However,

---

[1] The United States Supreme Court recently reiterated that courts should not rubber stamp administrative interpretations which the court finds inconsistent with the terms of the statute or the intent of Congress. (*FLRA* v. *Aberdeen Proving Ground* (1988) 485 U.S. __[99 L.Ed.2d 470, 475, 108 S.Ct. 1261], and cases cited.) Federal law, of course, requires courts to exercise the judicial function of declaring the true meaning of a statute when ·presented with a question of an agency's interpretation of congressional intent. (*Chevron U.S.A.* v. *Natural Res. Def. Council* (1984) 467 U.S. 837, 842-843, and fn.10 [81 L.Ed.2d 694, 702-703, 104 S.Ct. 2778]; *Rettig* v. *Pension Ben. Guar. Corp* (D.C. Cir. 1984) 744 F.2d 133, 140-141 [240 App.D.C. 118].) The District of Columbia Circuit explained the *Chevron* standard: "First, we must determine whether Congress had a specific intent as to the meaning of a particular phrase or provision. [Citation.] To do this, we analyze the language and legislative history of the provision. As the Court noted in *Chevron,* '[t]he judiciary is the final authority on issue[s] of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.' [Citation.] Thus, in ascertaining the congressional intent underlying a specific provision, we are not required to grant any particular deference to the agency's parsing of statutory language or its interpretation of legislative history." (*Ibid.*)

the commission was not free to disregard our decision. Our tripartite system of government requires the executive branch to be bound by judicial decisions on questions of law. We should not permit an unauthorized administrative decision to force us to reopen a question we have already decided. I see no legitimate basis for reconsidering our earlier decision, and so see no need to perform extensive analysis of the legislative history of the statute in order to justify our conclusion that section 351 means the same thing now as it meant in 1980.

Arguelles, J., concurred.