[No. B088448. Second Dist., Div. One. Dec. 20, 1995.]

BRAD WAISBREN, Plaintiff and Appellant, v.
PEPPERCORN PRODUCTIONS, INC., et al., Defendants and
Respondents.

**COUNSEL**

Steven D. Waisbren for Plaintiff and Appellant.

Anker & Hymes, Jonathan L. Rosenbloom and Douglas K. Schreiber for Defendants and Respondents.

**OPINION**

**MASTERSON, J.**—In the entertainment industry, talent agents and personal managers perform valuable services for their clients. Talent agents,

who seek to procure employment for artists, must be licensed under the Talent Agencies Act (Lab. Code, §§ 1700-1700.47). In contrast, personal managers, who advise and direct artists in the development of their careers, are not subject to any licensing requirements.

This appeal presents the question of whether a personal manager must be licensed under the Talent Agencies Act if he devotes an incidental portion of his business to the function of a talent agent—procuring employment for an artist. We conclude that he must be so licensed.

## BACKGROUND

Defendant Peppercorn Productions, Inc. (Peppercorn) is a California corporation specializing in the design and creation of puppets for use in the entertainment industry and advertising media. Peppercorn has also been involved in producing various television projects. Defendants David Pavelonis and Terrie Pavelonis are officers of Peppercorn.

In 1982, plaintiff Brad Waisbren agreed to promote Peppercorn. From 1982 through 1988, he performed numerous services for the company pursuant to an oral agreement. Among other things, Waisbren assisted in project development, managed certain business affairs, supervised client relations and publicity, performed casting duties, advised Peppercorn regarding the selection of artistic talent, coordinated production, and handled office functions, such as the hiring and firing of personnel. Occasionally, Waisbren procured employment for Peppercorn, but his efforts in that regard were incidental to his other responsibilities. For his services, Waisbren was to receive 15 percent of Peppercorn's profits.[1]

In 1988, Peppercorn terminated its relationship with Waisbren. In 1990, he filed suit against defendants, alleging that they had not paid him in accordance with the parties' agreement. By way of a second amended complaint filed in 1991, Waisbren alleged six causes of action, all of which sought relief based on an alleged breach of the agreement.[2]

In March 1994, defendants moved for summary judgment on the ground that the parties' agreement was void because Waisbren had performed the

---

[1]Waisbren contends that he was to receive 15 percent of "gross profits" less out-of-pocket expenses per project. Peppercorn claims that Waisbren's compensation was based on "net profits." To the extent the parties disagree on this point, it is not material to the question before us.

[2]Specifically, Waisbren alleged causes of action for breach of an oral contract, breach of an implied-in-fact contract, quantum meruit, fraud, bad faith denial of the existence of a contract, and accounting.

duties of a talent agent—by procuring employment for Peppercorn—without first obtaining the necessary license under the Talent Agencies Act. In opposing summary judgment, Waisbren admitted that he had no such license. However, he argued that a license was unnecessary since his procurement activities were minimal and merely incidental to his other responsibilities.[3] In May 1994, the trial court granted defendants' summary judgment motion. Waisbren filed a timely appeal from the judgment.

## DISCUSSION

■   Summary judgment is appropriate if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).)

"A defendant seeking summary judgment has met the burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action cannot be established [or that there is a complete defense to that cause of action]. . . . Once the defendant's burden is met, the burden shifts to the plaintiff to show that a triable issue of fact exists as to that cause of action. . . . In reviewing the propriety of a summary judgment, the appellate court independently reviews the record that was before the trial court. . . . We must determine whether the facts as shown by the parties give rise to a triable issue of material fact. . . . In making this determination, the moving party's affidavits are strictly construed while those of the opposing party are liberally construed." (*Hanooka* v. *Pivko* (1994) 22 Cal.App.4th 1553, 1558 [28 Cal.Rptr.2d 70], citations omitted; see also Code Civ. Proc., § 437c, subd. (o)(2).) We accept as undisputed facts only those portions of the moving party's evidence that are not contradicted by the opposing party's evidence. (*Kelleher* v. *Empresa*

---

[3]During discovery, defendants served Waisbren with the following request for admission: "That pursuant to the agreement you alleged existed between Peppercorn Productions, Inc. and you that you engaged in procuring employment for the services offered by Peppercorn Productions, Inc." Waisbren admitted the request, after objecting to it as vague, ambiguous, and unintelligible.

According to a declaration submitted by David Pavelonis, Waisbren negotiated deals on behalf of Peppercorn for regional television commercials and home video projects as well as a Dick Clark Productions pilot. Waisbren stated in his own declaration that his "attempt to explore new business opportunities for [Peppercorn] . . . constituted only a very small portion of the overall duties that I had with, and performed for, [Peppercorn]." Waisbren also submitted the declarations of two associates who stated that "any effort[] on the part of Mr. Waisbren to procure employment for Peppercorn Productions was relatively minimal" and that "[a] great majority of the functions and tasks performed by Mr. Waisbren for Peppercorn . . . were not associated or connected with the procurement of employment for Peppercorn . . . ."

*Hondurena de Vapores, S.A.* (1976) 57 Cal.App.3d 52, 56 [129 Cal.Rptr. 32].) In other words, the facts alleged in the declarations of the party opposing summary judgment must be accepted as true. (*Zeilman* v. *County of Kern* (1985) 168 Cal.App.3d 1174, 1179, fn. 3 [214 Cal.Rptr. 746].)

With these principles in mind, we turn first to the question of whether Waisbren had to be licensed as a talent agent, even though his efforts to procure employment for Peppercorn were minimal or incidental in relation to his other activities. Finding that a license was necessary, we then examine whether the trial court applied the proper remedy for Waisbren's unlicensed conduct (i.e., declaring the parties' agreement void and precluding Waisbren from seeking any recovery under it).

## A. *The Licensing Scheme*

The Talent Agencies Act (the Act) provides that "[n]o person shall engage in or carry on the occupation of a talent agency without first procuring a license therefor from the Labor Commissioner." (Lab. Code, § 1700.5.) A "talent agency" is "a person or corporation who engages in the occupation of procuring, offering, promising, or attempting to procure employment or engagements for an artist or artists." (*Id.* § 1700.4, subd. (a).)[4] An "artist," in turn, includes a broad spectrum of persons and entities working in the entertainment field.[5]

Unlike a talent agent, a "personal manager" is not covered by the Act or any other statutory licensing scheme. (Yanover & Kotler, *Artist/Management Agreements and the English Music Trilogy: Another British Invasion?* (1989) 9 Loy. Ent. L.J. 211, 211-214.) "Artists typically engage personal managers in addition to talent agents. . . . [¶] . . . In essence, 'the primary function of the personal manager is that of advising, counselling, directing and coordinating the artist in the development of the artist's career.' The manager's task encompasses matters of both business and personal significance. As business advisors, they might attend to the artist's finances, and they routinely organize the economic elements of the artist's personal and creative life necessary to bring the client's product to fruition. The personal

---

[4]The Act exempts procurement efforts related to recording contracts. (Lab. Code, § 1700.4, subd. (a).)

[5]"Artists" is defined as "actors and actresses rendering services on the legitimate stage and in the production of motion pictures, radio artists, musical artists, musical organizations, directors of legitimate stage, motion picture and radio productions, musical directors, writers, cinematographers, composers, lyricists, arrangers, models, and other artists and *persons* rendering professional services in motion picture, theatrical, radio, television and other entertainment enterprises." (Lab. Code, § 1700.4, subd. (b), italics added.) A "person" means "any individual, company, society, firm, partnership, association, corporation, . . . manager, or their agents or employees." (Lab. Code, § 1700.) In this case, there is no dispute that defendants qualify as "artists" under the Act.

manager frequently lends money to the neophyte artist, thereby speculating on a return from the artist's anticipated future earnings. The manager also serves as a liaison between the artist and other personal representatives, arranging their interactions with, and transactions on behalf of, the artist. On a more personal level, the manager often serves as the artist's confidant and alter ego. . . . [¶] By orchestrating and monitoring the many aspects of the artist's personal and business life, the personal manager gives the artist time to be an artist. That is, managers liberate artists from burdensome yet essential business and logistical concerns so that artists have the requisite freedom to discharge their artistic function and to concentrate on their immediate creative task . . . . In this regard, the personal manager is an indispensable element of an artist's career." (O'Brien, *Regulation of Attorneys Under California's Talent Agencies Act: a Tautological Approach to Protecting Artists* (1992) 80 Cal.L.Rev. 471, 481-483, fns. omitted (hereafter *Regulation of Attorneys*).)

As a practical matter, personal managers may occasionally find themselves in situations where they would like to procure employment for their clients. (See Hertz, *The Regulation of Artist Representation in the Entertainment Industry* (1988) 8 Loy. Ent. L.J. 55, 58-59, 63 (hereafter *The Regulation of Artist Representation*); Johnson & Lang, *The Personal Manager in the California Entertainment Industry* (1979) 52 So.Cal.L.Rev. 375, 375-376 (hereafter *The Personal Manager*).) That is not the issue before us, however. Rather, we must decide whether a person needs to be licensed under the Act if he occasionally procures employment for an artist. We conclude that a license is required.

## 1. *The Plain Meaning of the Act*

■ In construing the provisions of the Act, our goal is to ascertain and effectuate legislative intent. (*Burden* v. *Snowden* (1992) 2 Cal.4th 556, 562 [7 Cal.Rptr.2d 531, 828 P.2d 672].) In determining that intent, we look first to the language of the statute, giving effect to its plain meaning. (*Ibid.*)

The Act applies only if a person engages in the "occupation" of procuring employment for an artist. (Lab. Code, §§ 1700.4, subd. (a), 1700.5.) Waisbren contends that because "occupation" is defined as "the *principal* business of one's life" (see Webster's Third New Internat. Dict. (1981) p. 1560, col. 3, italics added), a license is not needed unless a person's principal responsibilities involve procuring employment for an artist. We disagree.

By limiting the concept of "occupation" to one's "principal" business endeavor, Waisbren ignores the possibility that a person can have more than

one job. Plainly, an individual can be engaged in an "occupation" even if he does not spend most of his time in that pursuit. Moreover, Waisbren's argument rests on only one definition of "occupation." That term also means "a craft, trade, profession or other means of earning a living." (Webster's Third New Internat. Dict., *supra*, p. 1560, col. 3.) Further, "occupation" is synonymous with "employment" (*ibid.*), which includes "temporary or occasional work or service for pay" (*id.* at p. 743, col. 3). As these additional definitions make clear, a person can hold a particular "occupation" even if it is not his principal line of work. Thus, the Act is entirely consistent with the concept of dual occupations—for example, being a personal manager *and* a talent agent.[6]

## 2. *The Remedial Purpose of the Act*

■ "The Act is a remedial statute. Statutes such as the Act are designed to correct abuses that have long been recognized and which have been the subject of both legislative action and judicial decision. . . . Such statutes are enacted for the protection of those seeking employment [i.e., the artists]." (*Buchwald* v. *Superior Court* (1967) 254 Cal.App.2d 347, 350-351 [62 Cal.Rptr. 364], citation omitted.)[7] Consequently, the Act should be liberally construed to promote the general object sought to be accomplished; it should "not [be] construed within narrow limits of the letter of the law." (*Henning* v. *Industrial Welfare Com.* (1988) 46 Cal.3d 1262, 1269 [252 Cal.Rptr. 278, 762 P.2d 442]; accord, *Buchwald* v. *Superior Court, supra*, 254 Cal.App.2d at p. 354.)[8] To ensure the personal, professional, and financial welfare of artists, the Act strictly regulates a talent agent's conduct.[9]

The statutory goal of protecting artists would be defeated if the Act applied only where a personal manager spends a significant part of his

[6]Our interpretation of the statutory language does not render the term "occupation" mere surplusage. (See Lab. Code, § 1700.4, subd. (a) [defining "talent agency" as a person who "engages in the occupation of procuring . . . employment . . . for an artist or artists"].) By using that term, the Legislature intended to cover those who are compensated for their procurement efforts.

[7]When *Buchwald* was decided, Labor Code section 1700.4 used the term "artists' manager" instead of "talent agency" and was part of the Artists' Managers Act. (See Stats. 1959, ch. 888, § 1, pp. 2921, 2922.) An "artists' manager" was defined as "a person who engages in the occupation of advising, counseling, or directing artists in the development or advancement of their professional careers and who procures, offers, promises or attempts to procure employment or engagements for an artist . . . ." (Stats. 1959, ch. 888, § 1, p. 2921.) In 1978, the Legislature changed the name of the statutory scheme and amended section 1700.4 to use the term "talent agency." (Stats. 1978, ch. 1382, §§ 3, 6, pp. 4575, 4576.) These changes did not alter the statute's remedial purpose.

[8]This rule of construction counsels against adopting Waisbren's definition of "occupation" since, by focusing on one's *principal* business, it is the most narrow of the various definitions. (See pt. A.1., *ante*.)

[9]For instance, an agent must (1) have his form of contract approved by the Labor Commissioner (Lab. Code, § 1700.23), (2) maintain his client's funds in a trust fund account

workday pursuing employment for artists. The fact that an unlicensed manager may devote an "incidental" portion of his time to procurement activities would be of little consolation to the client who falls victim to a violation of the Act. As a result, the licensing scheme contemplates that the "occasional talent agent," like the full-time agent, is subject to regulatory control.

We refuse to believe that the Legislature intended to exempt a personal manager from the Act—thereby allowing violations to go unremedied—unless his procurement efforts cross some nebulous threshold from "incidental" to "principal." Such a standard is so vague as to be unworkable and would undermine the purpose of the Act.[10]

### 3. *The Labor Commissioner's Interpretation of the Act*

The Labor Commissioner, who is statutorily charged with enforcing the Act (Lab. Code, § 1700.44, subd. (a)), has long taken the position that a license is required for incidental procurement activities. (See generally, *The Personal Manager, op. cit. supra*, 52 So.Cal.L.Rev. at pp. 389-393.) In *Derek v. Callan* (Jan. 14, 1982, Lab. Comr.) No. 08116, TAC 18-80, SFMP 82-80, a personal manager argued that "the Legislature meant to regulate only those whose primary purpose was the securing of employment for artists and not personal managers who might be involved in 'incidental' procurement of employment." (*Id.* at p. 6.) The Labor Commissioner rejected that argument, stating, "That is like saying you can sell one house without a real estate license or one bottle of liquor without an off-sale license." (*Ibid.*) "A talent agency license is necessary even where procurement activities are only 'incidental' to the agent's duties and obligations . . . ." (*Damon* v. *Emler* (Jan. 14, 1982, Lab. Comr.) No. TAC 36-79, SFMP 63, p. 4.)

The construction of a statute by an agency charged with its administration is entitled to great weight. (*Henning* v. *Industrial Welfare Com., supra*, 46 Cal.3d at p. 1269.) If the administrative agency's construction is

---

(*id.* § 1700.25), (3) record and retain certain information about his client (*id.* § 1700.26), (4) refrain from giving false information to an artist concerning potential employment (*id.* § 1700.32), and (5) avoid certain payment practices (*id.* §§ 1700.39-1700.41). In addition to his statutory obligations, an agent must comply with the regulations promulgated by the Labor Commissioner to implement the Act (Cal. Code Regs., tit. 8, § 12000 et seq.). (See generally, *Regulation of Attorneys, op. cit. supra*, 80 Cal.L.Rev. at pp. 487-490 [discussing the Act's restrictions on talent agents].)

[10]Perhaps a personal manager's procurement activities should no longer be considered "incidental" when they exceed 10 percent of his total business. Or perhaps the line should be drawn at 25 or 50 percent. We simply cannot make this determination because the Act provides no rational basis for doing so. Moreover, even if we could somehow justify using a particular figure, it would be virtually impossible to determine accurately whether a personal manager had exceeded it.

reasonable, a court should defer to it. (*Ibid.*) Because the Labor Commissioner's interpretation of the Act is reasonable, we agree with his analysis of the licensing requirement.

### 4. *Recent Legislative Action: The California Entertainment Commission*

Significantly, the Legislature has adopted the view that a license is required for incidental procurement activities.[11] In 1982, the Legislature created the California Entertainment Commission (the Commission) to "study the laws and practices of this state, the State of New York, and other entertainment capitals of the United States relating to the licensing of agents and representatives of artists in the entertainment industry in general . . . , so as to enable the commission to recommend to the Legislature a model bill regarding this licensing." (Former Lab. Code, § 1702, added by Stats. 1982, ch. 682, § 6, p. 2816 and repealed by Stats. 1984, ch. 553, § 6, p. 2187.)[12] The Commission was required to submit its report to the Legislature and the Governor no later than January 1, 1986. (Former Lab. Code, § 1703, added by Stats. 1982, ch. 682, § 6, p. 2816, as amended and repealed by Stats. 1984, ch. 553, §§ 5, 6, p. 2187.)

Of the many issues considered by the Commission, "the most important was whether personal managers or anyone other than a licensed talent agent should be allowed to procure employment for an artist. This was the true issue that the Commission was formed to resolve, as it has been the main point of contention between talent agents and personal managers throughout their history." (*The Regulation of Artist Representation, op. cit. supra,* 8 Loy. Ent. L.J. at p. 66, fn. omitted.) From June 1983 to January 1985, the Commission met 15 times to accomplish its mandate. On December 2, 1985, the Commission submitted its report (the Report) to the Legislature and the Governor.

The Report noted that, "[p]ursuant to [its] statutory mandate, the Commission studied the laws and practices of California and of New York and other

---

[11]We may properly resort to extrinsic aids, such as legislative history, in determining the intent of the Legislature. (*California Mfrs. Assn.* v. *Public Utilities Com.* (1979) 24 Cal.3d 836, 844 [157 Cal.Rptr. 676, 598 P.2d 836]; *Burden* v. *Snowden, supra,* 2 Cal.4th at p. 562.)

[12]The Commission consisted of ten members, three appointed by the Governor, three by the Speaker of the Assembly, and three by the Senate Rules Committee, plus the Labor Commissioner. (Former Lab. Code, § 1701, added by Stats. 1982, ch. 682, § 6, p. 2816 and repealed by Stats. 1984, ch. 553, § 6, p. 2187.) Each appointing power had to appoint a licensed talent agent, a personal manager, and an artist. (*Ibid.*) The members of the Commission were: talent agents Jeffrey Berg, Roger Davis, and Richard Rosenberg; personal managers Bob Finklestein, Patricia McQueeney, and Larry Thompson; artists Ed Asner, John Forsythe, and Cicely Tyson; and Labor Commissioner C. Robert Simpson, Jr. The Labor Commissioner chaired the Commission.

entertainment capitals of the United States. In the course of its deliberations, it analyzed the [Talent Agencies] Act in minute detail. [¶] In the judgment of a majority of the members of the Commission, the Talent Agencies Act of California is a sound and workable statute and the recommendations contained in this report will, if enacted by the California Legislature, make that Act a model statute of its kind in the United States." (Report at p. 4.)

The Report phrased the first issue to be addressed as follows: "Under what conditions or circumstances, if any, should personal managers or anyone other than a licensed talent agent be allowed to procure employment for an artist without being licensed as a talent agent?" (Report at p. 6.) The Report acknowledged that "[t]he principal, and philosophically the most difficult, issue before the Commission, the discussion of which consumed a substantial portion of the time of most of the meetings of the Commission was this first issue." (*Id.* at p. 7.) The Commission concluded that "[n]o person, including personal managers, should be allowed to procure employment for an artist in any manner or under any circumstances without being licensed as a talent agent." (Report, Executive Summary, p. 1.) The Report discussed the licensing issue at some length, stating:

"The position of the talent agents is that anyone who performs the same function as they in procuring employment for an artist should be subject to the same statutory and regulatory obligations as they are—nothing more and nothing less. Those obligations include regulation of contract terms and fees by the Labor Commissioner and the requirements of franchise agreements with unions representing the artists. Talent agents increasingly find themselves in competition with personal managers and others in seeking employment for clients. In the opinion of the talent agents, the issue is simply one of fairness: all who seek employment for an artist should be licensed or none should be licensed.

"Personal managers contend that the reality of the entertainment industry requires that, in the normal course of the conduct of their profession, they must engage in limited activities which could be construed as procuring employment. Such activity is only a minor and incidental part of their services to the artist. The essence of their service, which is counseling the artist in the development of his/her professional career, is not the kind of activity which can feasibly or legitimately be made the subject of licensure. They argue that if they are required to be licensed, they will not only be required to procure employment for their clients, but their fees, the length of the contracts, and other aspects of their service will be controlled by the Labor Commissioner and the unions. . . .

"The Commission attempted over many hours, and by diligent exploration and analysis of alternatives, to find a common ground of compromise on

which an answer to this long-standing industry controversy could be formulated, but without success.

"...................................

"Thus, in searching for permissible limits to activities in which an unlicensed personal manager, or anyone, could engage in procuring employment for an artist without being licensed as a talent agent, the Commission concluded that there is no such activity, that there are no such permissible limits, and that the prohibitions of the Act over the activities of anyone procuring employment for an artist without being licensed as a talent agent must remain, as they are intended to be, total. *Exceptions in the nature of incidental, occasional or infrequent activities relating in any way to procuring employment for an artist cannot be permitted: one either is, or is not, licensed as a talent agent, and, if not so licensed, one cannot expect to engage, with impunity, in any activity relating to the services which a talent agent is licensed to render.* There can be no 'sometimes' talent agent, just as there can be no 'sometimes' professional in any other licensed field of endeavor." (Report at pp. 8-12, italics added.)

Although the Commission concluded that the Act should remain unchanged with respect to requiring a license for any procurement activities (incidental or otherwise), the Commission did recommend statutory changes on other matters. (See Report at pp. 22-34.) In response, the Legislature adopted all of the Commission's recommendations, and the Governor signed them into law. (See Stats. 1986, ch. 488, §§ 1-19, pp. 1804-1808; 3d reading of Assem. Bill No. 3649 as amended Apr. 15, 1986 (1985-1986 Reg. Sess.) p. 3 ["This Bill is the result of a one and one-half year study conducted by the California Entertainment Commission"]; *Regulation of Attorneys, op. cit. supra,* 80 Cal.L.Rev. at p. 495 [the Legislature and Governor adopted the Commission's recommendations with some minor alterations in language]; *The Regulation of Artist Representation, op. cit. supra,* 8 Loy. Ent. L.J. at p. 66 [the Legislature codified the Commission's Report in the Act].) In accordance with the Commission's advice, the Legislature did not alter the requirement of a license for persons who occasionally procure employment for artists.[13]

By creating the Commission, accepting the Report, and codifying the Commission's recommendations in the Act, the Legislature approved the

[13]Of significance, the Legislature had directed the Commission to study New York's licensing law (former Lab. Code, § 1702, added by Stats. 1982, ch. 682, § 6, p. 2816 and repealed by Stats. 1984, ch. 553, § 6, p. 2187), and the Commission did so (Report at p. 3). For several decades, New York's statutory scheme has expressly exempted persons whose "business only *incidentally* involves the seeking of employment [for artists]." (N.Y. Gen. Bus. Law § 171, subd. 8 (McKinney 1988), italics added; see also *Mandel* v. *Liebman* (1951) 303 N.Y. 88, 97-98 [100 N.E.2d 149, 155] [construing license exception for incidental

Commission's view that "[e]xceptions in the nature of incidental, occasional or infrequent activities relating in any way to procuring employment for an artist cannot be permitted: one either is, or is not, licensed as a talent agent . . . ." (Report at p. 11.) This legislative approval extends to the Commission's finding that the Act imposes a *total* prohibition on the procurement efforts of unlicensed persons. (*Ibid.*) Given the Legislature's wholesale endorsement of the Report, we conclude, as did the Commission, that the Act requires a license to engage in *any* procurement activities. (Cf. *Harris* v. *Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1155-1156 [278 Cal.Rptr. 614, 805 P.2d 873] [in amending statute without altering portion previously construed by the courts, Legislature acquiesces in previous judicial construction].)

### 5. *The Act's Limited Exception for Unlicensed Persons*

The Act specifically provides that an unlicensed person may nevertheless participate in negotiating an employment contract for an artist, provided he does so "in conjunction with, and at the request of, a licensed talent agency." (Lab. Code, § 1700.44, subd. (d).)[14] Under this provision, a personal manager can seek employment for his client as part of a cooperative effort with a licensed talent agent. (See *Regulation of Attorneys, op. cit. supra,* 80 Cal.L.Rev. at p. 500.) However, this limited exception to the licensing scheme would be unnecessary if incidental or occasional procurement efforts did not require a license in the first place. We refuse to read the Act in such a way as to render superfluous the exception contained in Labor Code section 1700.44, subdivision (d).[15]

### 6. *Prior Judicial Construction of the Act*

In *Buchwald* v. *Superior Court, supra,* 254 Cal.App.2d 347, a dispute arose between the members of a musical group (known as the "Jefferson Airplane") and their personal manager. The parties' written agreement stated that the manager had not agreed to obtain employment for the group and that he was not authorized to do so. (*Id.* at p. 351.) The group alleged that, despite the contractual language, the manager had in fact procured bookings for them. In seeking to avoid the licensing requirement, the manager argued

procurement activities]; *Friedkin* v. *Harry Walker, Inc.* (1977) 90 Misc.2d 680, 682 [395 N.Y.S.2d 611, 613] [finding exception not applicable].) Thus, the Commission and the Legislature clearly decided not to adopt a licensing exception for incidental procurement efforts.

[14]This provision was first enacted in 1982 (Stats. 1982, ch. 682, § 3, p. 2815) but was to remain in effect only until January 1, 1986 (Stats. 1984, ch. 553, § 3, p. 2186). As a result of the Commission's work (see Report at p. 19), the Legislature made the provision permanent, effective January 1, 1986 (Stats. 1986, ch 488, §§ 15, 19, pp. 1807, 1808).

[15]Waisbren does not contend that this exception is applicable here.

260

that the written agreement established, as a matter of law, that he was not subject to statutory regulation.

The court rejected that contention, stating: "The court, or as here, the labor commissioner, is free to search out illegality lying behind the form in which a transaction has been cast for the purpose of concealing such illegality. [Citation.] 'The court will look through provisions, valid on their face, and with the aid of parol evidence, determine that the contract is actually illegal or is part of an illegal transaction.' " (254 Cal.App.2d at p. 355.) Thus, while *Buchwald* did not address the precise question of whether a license is necessary for incidental procurement activities, it did hold generally that procurement efforts require a license and that the substance of the parties' relationship, not its form, is controlling.

Waisbren responds that the holding in *Wachs* v. *Curry* (1993) 13 Cal.App.4th 616 [16 Cal.Rptr.2d 496] compels the conclusion that a personal manager need not be licensed if he procures employment for an artist on an occasional basis. We disagree.

In *Wachs,* the plaintiffs, who were personal managers, raised a constitutional challenge to the Act on its face. More specifically, they argued that (1) the Act's exemption for procurement activities involving recording contracts (see fn. 4, *ante*) violated the equal protection clause, and (2) the Act's use of the term "procure" was so vague as to violate due process. (13 Cal.App.4th at pp. 620, 624-625, 628-629.) The court rejected both contentions. On the first issue, the court held that there was a rational basis for exempting recording contracts from the licensing requirement. (*Id.* at pp. 624-626.) On the second issue, the court held that the term "procure" was not unconstitutionally vague. (*Id.* at pp. 628-629.)

In resolving the question of whether the term "procure" was too vague, the court initially noted that the Act applies to persons engaged in the "occupation" of procuring employment for artists. (13 Cal.App.4th at pp. 626-627.) After defining "occupation" as one's principal line of work, the court stated that the licensing scheme did not apply unless a person's procurement activities constituted a "significant part" of his business. (*Id.* at pp. 627-628.) Because the court expressly declined to say what it meant by "significant part" (*id.* at p. 628), the import of its discussion on this point is unclear. In any event, the court recognized that "[p]laintiffs[] concentrate their attack on the alleged vagueness of the word 'procure' " (*ibid.*) and that ". . . the *only* question before us is whether the word 'procure' in the context of the Act is so lacking in objective content that it provides no standard at all by which to measure an agent's conduct" (*ibid.*, italics deleted).

Given *Wachs*'s recognition of the limited nature of the issue before it, we regard as dicta the court's interpretation of the term "occupation" and its statement that the Act does not apply unless a person's procurement function is significant. Because the *Wachs* dicta is contrary to the Act's language and purpose, we decline to follow it. In that regard, we note that *Wachs* applied an overly narrow concept of "occupation" and did not consider the remedial purpose of the Act, the decisions of the Labor Commissioner, or the Legislature's adoption of the view (as expressed in the California Entertainment Commission's Report) that a license is necessary for incidental procurement activities. Thus, we conclude that the *Wachs* dicta is incorrect to the extent it indicates that a license is required only where a person's procurement efforts are "significant."[16]

## B.  *The Sanction for Unlicensed Work*

■ "Since the clear object of the Act is to prevent improper persons from becoming [talent agents] and to regulate such activity for the protection of the public, a contract between an unlicensed [agent] and an artist is void." (*Buchwald* v. *Superior Court, supra*, 254 Cal.App.2d at p. 351.) " 'The general rule controlling in cases of this character is that where a statute prohibits . . . the doing of an act, the act is void, and this [is the consequence], notwithstanding that the statute does not expressly pronounce it so.' " (*Severance* v. *Knight-Counihan Co.* (1947) 29 Cal.2d 561, 568 [177 P.2d 4, 172 A.L.R. 1107].)

■ Waisbren nevertheless contends that declaring the parties' agreement to be void is too severe a penalty, especially in light of the fact that the Act does not contain criminal penalties for licensing violations. We disagree. Nothing in the case law requires the existence of criminal penalties as a prerequisite to declaring an illegal contract to be void. Moreover, the legislative history of the Act directly contradicts Waisbren's contention. In examining the licensing issue, the California Entertainment Commission

---

[16]Waisbren's reliance on *Raden* v. *Laurie* (1953) 120 Cal.App.2d 778 [262 P.2d 61] is also misplaced. In that case, a personal manager sued an artist for sums allegedly due under a written contract. The contract expressly stated that the manager was not authorized to seek employment for the artist. Nevertheless, the artist sought summary judgment on the ground that the manager had in fact agreed to procure such employment. The manager opposed the summary judgment motion by submitting evidence that he had not so agreed. The trial court granted summary judgment. The Court of Appeal reversed, finding that there was conflicting evidence regarding the substance of the parties' agreement. (*Id.* at p. 783.) By contrast, in this case, there is no dispute that Waisbren actually engaged in some procurement activities. The undisputed evidence thus presents a pure question of law: whether a license is required where a personal manager occasionally procures employment for an artist. (See also *Buchwald* v. *Superior Court, supra*, 254 Cal.App.2d at pp. 355-357 [distinguishing *Raden* on ground that there was no evidence in that case indicating that personal manager had actually procured employment for artist].)

specifically addressed the question of whether criminal sanctions should be imposed for violations of the Act. (Report at pp. 15-18.) It recommended that the Legislature not enact criminal penalties, in part because "the most effective weapon for assuring compliance with the Act is the power . . . to . . . declare any contract entered into between the parties void from the inception." (*Id.* at p. 17.) By following the Commission's advice and not enacting criminal penalties, the Legislature approved the remedy of declaring agreements void if they violate the Act. Thus, an agreement that violates the licensing requirement is illegal and unenforceable despite the lack of criminal sanctions.

As explained by our Supreme Court: "[T]he courts generally will not enforce an illegal bargain or lend their assistance to a party who seeks compensation for an illegal act. The reason for this refusal is not that the courts are unaware of possible injustice between the parties, and that the defendant may be left in possession of some benefit he should in good conscience turn over to the plaintiff, but that this consideration is outweighed by the importance of deterring illegal conduct. Knowing that they will receive no help from the courts and must trust completely to each other's good faith, the parties are less likely to enter an illegal arrangement in the first place." (*Lewis & Queen* v. *N. M. Ball Sons* (1957) 48 Cal.2d 141, 150 [308 P.2d 713].)

Further, it does not matter that some of Waisbren's causes of action sounded in tort rather than contract. " ' "No principle of law is better settled than that a party to an illegal contract cannot come into a court of law and ask to have his illegal objects carried out . . . . [T]he test [is] whether the plaintiff can establish his case otherwise than through the medium of an illegal transaction to which he himself is a party." ' " (*Wong* v. *Tenneco, Inc.* (1985) 39 Cal.3d 126, 135 [216 Cal.Rptr. 412, 702 P.2d 570], internal citation and italics omitted; see also *Hydrotech Systems, Ltd.* v. *Oasis Waterpark* (1991) 52 Cal.3d 988, 997-1002 [277 Cal.Rptr. 517, 803 P.2d 370] [unlicensed contractor cannot sue for fraud].)[17]

Because all of Waisbren's causes of action are based on his illegal agreement or business arrangement with Peppercorn, he cannot establish his case against defendants "otherwise than through the medium of an illegal transaction to which [he] [was] a party." (*Wong* v. *Tenneco, Inc., supra,* 39 Cal.3d at p. 135, italics omitted.) Accordingly, the trial court properly disposed of the complaint in its entirety.

---

[17]Nothing in *Tenzer* v. *Superscope, Inc.* (1985) 39 Cal.3d 18 [216 Cal.Rptr. 130, 702 P.2d 212] is to the contrary. *Tenzer* simply recognized that the statute of frauds does not bar a cause of action for fraud based on an oral misrepresentation. (*Id.* at pp. 28-31.) *Tenzer* does not authorize any cause of action based on an *illegal* agreement.

## C. *The Propriety of Summary Judgment*

Waisbren argues that summary judgment was improper because there were disputed issues of fact as to whether he was a partner and coproducer with Peppercorn. According to Waisbren, the Act does not apply to an artist's "partner" or "co-producer." Regardless of the merits of Waisbren's interpretation of the Act—on which we express no opinion—he did not properly raise this argument in opposing summary judgment. His opposition papers did not make any such legal argument, and his separate statement (see Code Civ. Proc., § 437c, subd. (b)) did not set forth facts in support of that argument. Consequently, he waived this basis for opposing summary judgment. (See *North Coast Business Park* v. *Nielsen Construction Co.* (1993) 17 Cal.App.4th 22, 28-32 [21 Cal.Rptr.2d 104]; *United Community Church* v. *Garcin* (1991) 231 Cal.App.3d 327, 335-337 [282 Cal.Rptr. 368].)

Finally, Waisbren contends that the trial court should have continued the hearing on the summary judgment motion to allow him time to engage in additional discovery. This contention is without merit. We recognize that a trial court must order a continuance and allow the taking of discovery where "facts *essential* to justify opposition exist but cannot, for reasons stated, then be presented." (Code Civ. Proc., § 437c, subd. (h), italics added.) However, in opposing summary judgment, Waisbren did not explain how the outstanding discovery was related to the issues raised by the motion. Further, the motion was based solely on an issue within Waisbren's knowledge, i.e., whether he had procured any employment for Peppercorn. He obviously did not need to obtain discovery from defendants to dispute or address that issue. Indeed, the evidence he submitted in opposition to the motion left no doubt that he had engaged in such activities. (See fn. 3, *ante*.) For these reasons, the trial court did not abuse its discretion in denying Waisbren's request that the hearing on the motion be continued.

DISPOSITION

The judgment is affirmed.

Spencer, P. J., and Ortega, J., concurred.

A petition for a rehearing was denied January 17, 1996, and appellant's petition for review by the Supreme Court was denied March 14, 1996.