Filed 5/15/25  Lehrer-Graiwer v. Shokrian CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| JONATHAN LEHRER-GRAIWER et al.,<br><br>    Plaintiffs, Cross-defendants and Respondents,<br><br>    v.<br><br>JASMIN SHOKRIAN,<br><br>    Defendant, Cross-complainant and Appellant. | B326283<br><br>Los Angeles County<br>Super. Ct. No. BC685351 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lawrence Cho, Judge.  Affirmed.

Eviction Defense Network and Simon R. Sherred for Defendant, Cross-Complainant and Appellant.

Ecoff, Campain & Kay, Lawrence C. Ecoff and Alberto Campain for Plaintiffs, Cross-Defendants and Respondents.

———————————

After a trial by jury, respondents Jonathan Lehrer-Graiwer and Sarah Lehrer-Graiwer (collectively plaintiffs) recovered a judgment of $150,904.75 against their tenant Jasmin Shokrian (Shokrian). Shokrian appeals. We affirm.

## FACTUAL BACKGROUND

### A.   *The Property*

In April 2016 Jonathan[1] bought a triplex at 967 Maltman Avenue in Los Angeles. He and his daughter Sarah are joint owners of the property which is located on a ridge. The top unit is on the street level, the middle unit is one level down and there is a very small studio unit on a lower third level. Outside the studio unit is a patio above a garden, which are completely separate from the middle unit. Because the property is on a ridge and a hill, there are "very nice views of the Santa Monica Mountains to the west."

### B.   *Plaintiffs' Plan for the Property*

Plaintiffs planned to renovate the top and middle units for Sarah to use as her primary residence. Sarah was going to have a child. Plaintiffs had no remodeling plans for the studio unit which was rented to a lone tenant. They estimated that obtaining the permits and approvals for the renovation project would take roughly a year and a half. Plaintiffs decided to rent the middle unit to help pay the mortgage and "not to have the unit just vacant for a year."

---

[1]    We refer to the Lehrer-Graiwers by their first names for clarity.

2

Sarah placed an ad on Craigslist. Shokrian responded to the ad. Shokrian indicated she had been self-employed for the past 15 years and grossed an income of $100,000 per year.

## C. *The Addendum*

Plaintiffs and Shokrian agreed to a reduced monthly rent of $2,750 in consideration of a one-year only tenancy. (Originally, plaintiffs were asking for $3,000.) Jonathan presented two documents for Shokrian to sign: a lease and a separate settlement and release agreement, which the trial court called the "Addendum." Shokrian signed both, acknowledging that the rental was for one year only. As Jonathan put it, "a critical condition was that [Shokrian] understood that this was a temporary rental because of our need to renovate the property, and [Shokrian] said she understood that. That's why I gave her the settlement and release agreement in which she stated that she understood that I would not rent . . . the apartment to her if she did not agree to move within the year when given the . . . 60-day notice."

By signing the Addendum, Shokrian waived tenant protections under the Los Angeles Rent Stabilization Ordinance (RSO). (Gov. Code, § 7060 et seq. [rent control of residential property]; Civ. Code, § 1946.1 [renewal of lease for a term not specified].) Jonathan explained that the purpose of the separate Addendum "was to make it very clear to Ms. Shokrian the importance of her to understand that we were leasing that unit to her on a temporary one-year basis and that if she had any qualms or did not want to agree to that, then we couldn't lease to her, and that her agreement to vacate the property after the 60-day notice was a condition to our leasing to her . . . that we

wouldn't lease the property to her unless she agreed to that term because of our need to renovate the property for my daughter."

When Shokrian first visited the unit, Sarah told her they intended to rent the apartment for one year only.

## D. *The Lease Agreement*

The Lease Agreement is a form prepared by the California Apartment Association. The effective date of the lease was September 1, 2016 and the ending date was August 31, 2017.

Under the Lease Agreement, gas, electricity and trash were the responsibility of the tenant. Plaintiffs and Shokrian agreed Shokrian would pay an additional $40 for electricity. Because there was only one gas meter, Jonathan split the cost at 60 percent for the upper unit, 40 percent for the middle unit which Shokrian leased, and nothing for the bottom unit because it had no gas appliances. Sometime in 2018, Shokrian's unit got its own gas meter.

When Shokrian signed the lease and Addendum, she posed no questions about either document. On September 1, 2016, Shokrian moved in.

## E. *Housing Services Awarded and Revoked*

Because Shokrian "seemed to be a reasonable individual," plaintiffs decided to allow her to use the "amenities," that is, off-street parking, a laundry room, and garden areas. Plaintiffs agreed to allow Shokrian parking "as a temporary accommodation while she was there for the one-year period" and they also allowed her to use the laundry room. According to Jonathan, he gave Shokrian the household services "without charge and as a goodwill gesture."

4

On November 11, 2017, Jonathan notified Shokrian that she could no longer use the garage or driveway due to construction.  He also notified her that she could not use the laundry room (a separate room next to the middle unit) because the construction required use of the laundry room area.  And she could not use the patio or garden area because Sarah and her family would be using it exclusively.

According to Jonathan, there is nothing in the Lease Agreement giving Shokrian the right to use the garage, laundry room, or garden area.  Shokrian acknowledges the Lease Agreement was silent about household services.  The boxes for parking are not checked in the Lease Agreement and the Lease Agreement says nothing about the laundry room.

F.    ***Reduction of Rent Because of Revocation of Housing Services***

Shokrian's response to the notification that she could no longer use these amenities was to file a complaint with the Los Angeles Housing and Community Investment Department, Rent Stabilization Division – Investigation & Enforcement (the City).  The City notified plaintiffs of the complaint by letter dated December 29, 2017.  The letter, signed by Brett Terrell as "Housing Investigator," states that when housing services are reduced, there must be a rent reduction.  The letter assessed $200 per month for loss of use of the garage, $60 per month for loss of use of laundry facilities, and $20 per month for the loss of use of the garden/patio area, a reduction totaling $280.

Jonathan disputed these assessments by letter.  He objected, principally on the ground that there had not been a hearing and no opportunity for him to object.  Jonathan asked

about appeals procedures and he never got a response. He did not reduce the rent.

According to Terrell, the City does not have authority to tell a landlord not to remove a household service; it can only direct a decrease in rent to reflect the decrease in a household service.

Paragraph 39 of the Lease Agreement states that if there are any changes in the Lease Agreement, it must be in writing and signed by both parties. Terrell conceded at trial that the Lease Agreement did not provide for household services and admitted that the lease would have to be amended to reflect those services in order to recover if they were revoked.

G. *Soured Relations between Plaintiffs and Shokrian*

The relationship between plaintiffs and Shokrian soon soured. In Jonathan words, "[p]retty soon . . . she first became very demanding on items within the apartment that she felt were not adequately fixed, and then she started paying her rent late, and I several times had to send her notices about her late payments. And then she became very aggressive and, I would say, even abusive and threatening when she didn't like something or she didn't like that I had requested her to pay utilities, even threatening to report me to authorities. [¶] So, yeah, things turned from a very friendly—what I thought was a friendly relationship to a very nasty relationship very quickly."

There was a great deal of litigation between plaintiffs and Shokrian. According to Jonathan, plaintiffs sued Shokrian four times. According to Shokrian, it was seven times. Apparently there were also restraining orders, one of which seems to have led to Shokrian's arrest.

## H.    *Plaintiffs Give Shokrian a 60-day Notice*

At the end of one year on August 30, 2017, plaintiffs gave Shokrian a 60-day notice to quit.  Despite receiving the 60-day notice, Shokrian refused to vacate the property.

Plaintiffs did not hear from Shokrian after the 60-day notice was served on her.  However, in October 2017, respondents received a notice from the City that plaintiffs were in violation of the RSO by pursuing an illegal eviction.  Shokrian had not told Jonathan she intended to contact the City.

Jonathan did not think they were evicting Shokrian.  "I was giving her the notice under the agreement that she had agreed to and notifying her when she needed to move because there was no set date under our agreement of when I would give her the 60-day notice."

## PROCEDURAL HISTORY

When Shokrian would not leave, plaintiffs filed a complaint against her on December 1, 2017, alleging two causes of action. The first cause of action alleged breach of contract and the second cause of action alleged fraud in the inducement.  The complaint alleged that plaintiffs and Shokrian entered into a Lease Agreement on August 31, 2016 for the period of one year "only inasmuch as Plaintiff wished to do extensive remodeling to the Subject Property [hereafter the property] that would require that it be vacant."  Plaintiffs alleged they had served Shokrian with a 60-day notice to quit on August 30, 2017, but Shokrian refused to vacate the property which resulted in damages to plaintiffs.  The Lease Agreement is attached to the complaint as Exhibit A.

The first cause of action also alleged that Shokrian, by signing the Addendum, had waived her rights under the RSO.

7

(Gov. Code, § 7060 et seq.; Civ Code, § 1946.1.)  The Addendum is attached to the complaint as Exhibit B.

The second cause of action alleged that Shokrian had agreed to vacate the property upon 60 days notice in consideration of which plaintiffs reduced the rent from $3,000 to $2,750 per month.  Plaintiffs alleged that Shokrian had no intention of "performing under the terms of the contract and induced Plaintiffs to enter into the contract based upon her false promises."

Shokrian answered the complaint, denying liability and asserting multiple affirmative defenses.  She also filed a cross-complaint alleging causes of action for breach of the covenant of quiet enjoyment, declaratory relief, and violations of Los Angeles Municipal Code section 151.10(A) [liability of person who accepts rent in excess of RSO] and Civil Code section 1940.9 [landlord must make arrangement with tenant if there is no separate gas meter].  Plaintiffs answered the cross-complaint, denying liability and raising multiple affirmative defenses.

The cause of action for declaratory relief in Shokrian's cross-complaint asked the trial court to find that the RSO governed the tenancy at issue.  After plaintiffs stipulated that the RSO applied to the Shokrian's unit, the court dismissed this cause of action as moot.

On September 1, 2022, the trial court granted Shokrian judgment on the pleadings on the first cause of action (breach of contract) in the complaint.  The court examined the Addendum and found that expiration of a fixed term was not cause for eviction under the RSO (L.A Mun. Code, § 151.09) and the waiver of protections under the RSO set forth in the Addendum was void as against public policy.  The latter provision is found in Los

Angeles Municipal Code section 151.10(D). The trial court denied the motion for judgment on the pleadings on the second cause of action for fraud in the inducement, ruling that plaintiffs were not asking the court to enforce any provisions of the Lease Agreement, but were asking for relief "from having been allegedly induced into entering the illegal lease agreement. The fact that provisions of a contract are unenforceable as against public policy does not excuse a party who fraudulently induced another into entering into the unenforceable contract in the first place."

The complaint's second cause of action for fraud and the cross-complaint were tried to a jury, which returned a series of special verdicts on September 15, 2022. At trial Shokrian gave several reasons why she would not vacate the unit. She testified that financially she was not in a "good position." She had paid over $15,000 in legal fees, which were funds that should have paid her rent. Moving is expensive and costs $15,000. She also was of the opinion that she has a right to live there: "I have a right to live in this apartment, so this isn't about my right to stay there." At another juncture she testified that after she got the 60-day notice, she contacted the City. A person working for City (whom she did not identify) allegedly told her that she did not have to move and did not need to tell plaintiffs anything.

Shokrian's health also seems to have played a role in her refusal to vacate the unit. She suffered a miscarriage and discovered a lump in her breast which led to surgery in December 2017. Finally, it appears Shokrian decided to stay because, as discussed below, she stopped paying rent in October 2019 with the exception of one payment made in February 2022. Beginning in October 2019, she was living rent-free.

9

In contrast, Sarah testified it was a red flag that Shokrian wanted the floors replaced in the bathroom and kitchen. And Shokrian made demands about the patio and bath that suggested she wanted to stay longer than one year. Shokrian demanded $5,200 per month relocation benefits and would not move out unless she was paid relocation benefits. She stayed during the remodeling.

On the complaint's second cause of action for fraud, the jury concluded that Shokrian, from the very beginning, intended to stay longer than the one year. The jury found Shokrian made a promise to plaintiffs that she did not keep or intend to keep and that plaintiffs were entitled to $150,904.75. On Shokrian's cause of action for breach of quiet enjoyment, the jury found plaintiffs did not interfere with Shokrian's right to use and occupy the rental unit. The jury entered special verdicts on utility charges and the cancellation of housing services, finding that Shokrian was not entitled to recover anything as a result of the cancellation of housing services. The damages awarded by the jury were based on unpaid rent. Shokrian had not paid rent since October 2, 2019 with the exception of one check on February 2, 2022 for $3,034.16. (Plaintiffs had refused to accept checks after that date because they had pending unlawful detainer actions against Shokrian.)

On October 6, 2022, the trial court entered judgment conforming with the special verdicts. The judgment awarded plaintiffs $150,904.75. On December 5, 2022, the court denied Shokrian's motion for judgment notwithstanding the verdict or, in the alternative, a new trial. Shokrian filed a timely notice of appeal.

10

After the trial, plaintiffs filed motions for attorney fees and rescission of the contract. On November 1, 2022, the trial court denied both motions. It ruled that the Lease Agreement and the Addendum were void as a matter of public policy; therefore the attorney fee provision was not enforceable. Rescission was unavailable as a remedy since it had not been sought in the complaint. Rescission was also unavailable after trial because shortly before trial plaintiffs had declined an invitation to add rescission by amending their complaint. The court found plaintiffs' conduct in seeking to waive the RSO egregious. On January 11, 2023, plaintiffs filed a notice of appeal which they later abandoned. The only issues before us in this appeal are those brought by Shokrian.

## DISCUSSION

Shokrian presents two contentions on appeal. First she argues the trial court erroneously allowed plaintiffs to sue on an illegal contract to obtain their illegal expectations "even if they use the word 'fraud' instead of 'breach.'" Next, she argues the jury's verdict of recovery of zero damages for rescission of household services was inconsistent with the City's determination that plaintiffs had illegally revoked household services. We take each contention in turn.

A. ***The Trial Court Properly Allowed the Verdict to Stand on the Cause of Action for Fraud in the Inducement.***

I. **The Elements Fraud in the Inducement Were Met**

"Actual fraud, within the meaning of this chapter, consists in any of the following acts, committed by a party to the contract,

11

or with his connivance, with intent to deceive another party thereto, or to induce him to enter into the contract: [¶] . . . [¶] 4. A promise made without any intention of performing it." (Civ. Code, § 1572.)

Fraud in the inducement occurs when the promisor knows what he or she is signing but the promisor's consent was induced by fraud. (1 Witkin, Summary of Cal. Law (11th ed. 2017) Contracts, § 298, p. 317.) As the Restatement puts it, "[i]f a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient." (Rest.2d, Contacts, § 164, subd. (1).)

There are three requirements, in addition to the misrepresentation: the misrepresentation must have been either fraudulent or material; the misrepresentation must have induced the recipient to make the contract; and the recipient must have been justified in relying on the misrepresentation. (Rest.2d, Contacts, § 164, com. a, at p. 445.) "No legal effect flows from either a non-fraudulent or a fraudulent misrepresentation unless it induces action by the recipient, that is, unless he manifests his assent to the contract in reliance on it." (*Id.*, § 164, com. c, at p. 446.)

In this case, the jury found in its special verdicts that Shokrian made a promise to plaintiffs she did not intend to keep; she intended that plaintiffs rely on her promise; plaintiffs reasonably relied on Shokrian's promise; Shokrian did not do as she promised; and plaintiffs' reliance on Shokrian's promise was a substantial factor in causing them harm.

Shokrian promised plaintiffs she would vacate the apartment after one year, a promise she did not keep or intend to

12

keep.  That the expiration of the term of the tenancy is not grounds for eviction under the RSO (L.A Mun. Code, § 151.09), as the trial court found, is a principle that is independent from, and has no connection with, Shokrian's agreement with plaintiffs by which she promised to vacate the apartment after one year.  Nor does the RSO give Shokrian license to make false promises.  In short, her promise to vacate after one year was essential to plaintiffs' plans; her promise induced plaintiffs to enter into the Lease Agreement.  As the record of this case confirms, plaintiffs sustained substantial harm as a result of entering into the Lease Agreement with Shokrian.

The requirements of fraud in the inducement were met in this case.

II.      **Assuming the Lease Agreement was Illegal, Its Illegality Does Not Defeat the Cause of Action for Fraud in the Inducement.**

Shokrian contends the trial court allowed plaintiffs to sue on a "contract" it found to be illegal.  She makes this argument without differentiating between the Lease Agreement and the Addendum.  Shokrian contends the "trial court found the contract was illegal, but it nevertheless allowed [plaintiffs] to proceed with a fraud claim based entirely upon their expectations under that illegal contract."  She cites the generally accepted proposition that " ' "a party to an illegal contract cannot come into a court of law and ask to have its illegal objects carried out." ' " (*Wong v. Tenneco, Inc.* (1985) 39 Cal.3d 126, 135 (*Wong*).)  While we agree with the general principle, we disagree that it is implicated here.

Shortly before trial, the trial court granted Shokrian's motion for judgment on the pleadings on the first cause of action for breach of contract.  In doing so, the trial court addressed

13

paragraphs 1 and 2 of the Addendum which we set forth in the margin.[2]

The trial court ruled that paragraph 1 of the Addendum was void as against public policy and held that plaintiffs' "assertion of the expiration of a fixed term tenancy as the basis for an eviction fails because []RSO does not recognize that basis as a permissible basis for eviction. . . . Thus, the provision of the Addendum that [plaintiffs] claimed has been breached is unenforceable as against public policy as it is directly prohibited by []RSO." The court went on to rule that to the extent plaintiffs relied upon paragraph 2 of the Addendum, "that paragraph purporting waiver of []RSO is itself void as against public policy.

---

[2]    "1. After the term of the rental agreement entered into concurrently between Tenants and Owner, Tenants agree to voluntarily terminate Tenants' tenancy, to vacate the Apartment, and to return possession to Owner within 60 days of Owner's personal service of or mailing of written notice by certified mail requesting that Tenants vacate the Apartment.

"2. Tenants, and each of them, hereby waive, release and permanently discharge Owner from all of Tenants' potential relocation rights and benefits and Owner's obligations under the RSO, the Ellis Act, and the Notice Requirement, including, but not limited to, those rights, benefits, and duties provided in [Los Angeles Municipal Code sections] 47.06D, 151.09.A.10, 151.09G, and 151.22 through 151.28, California Government Code [sections] 7060.2 and 7060.4, and the notice requirements of California Civil Code [section] 1946.1 to which Tenants may otherwise be entitled if Tenants did not agree to voluntarily vacate the Apartment hereunder."

[Los Angeles Municipal Code section] 151.07(F)[3] ('[a]ny agreement . . . waiving any of the provisions contained in the Article shall be void as contrary to public policy')."

The sole cause of action tried against Shokrian alleged fraud in the inducement, that is, Shokrian's false promise to move out upon 60 days notice when the tenancy expired on August 31, 2017, which in turn induced plaintiffs to sign onto the Lease Agreement as well. As the trial court pointed out, "[d]espite being able to enforce the illegal lease," plaintiffs sued on that promise and sought damages for fraud. By this cause of action they did not try to enforce the lease to obtain possession of the property.

It appears Shokrian's argument is that the trial court's ruling voiding terms in the Addendum as against public policy renders the Lease Agreement illegal as well. Thus she argues that when a "party's claim for damages depends on proving they entered an illegal contract, that claim is barred by the illegality rule."

For the sake of argument, we will assume the Lease Agreement is illegal.

First, "[t]here is no doubt that the general rule requires the courts to withhold relief under the terms of an illegal contract or agreement which is violative of public policy." (*Tri-Q, Inc. v. Sta-Hi Corp.* (1965) 63 Cal.2d 199, 218.) Illegality, however, is not the only factor to consider in deciding whether to grant a party relief. When the evidence shows that a party seeks to enforce an illegal contract or recover compensation for an illegal act, the trial court has both the power and duty to ascertain the true facts

---

3   The reference should be to section 151.10(D).

15

in order that it may not unwittingly lend its assistance to the consummation or encouragement of what public policy forbids. (*Lewis & Queen v. N. M. Ball Sons* (1957) 48 Cal.2d 141, 147–148, superseded by statute on other grounds as stated in *McBarron v. Kimball* (1962) 210 Cal.App.2d 218, 220.)

That being said, trial courts are advised to tread carefully in deciding whether or not to grant relief in cases involving illegalities.  "The rule that the courts will not lend their aid to the enforcement of an illegal agreement or one against public policy is fundamentally sound.  The rule was conceived for the purposes of protecting the public and the courts from imposition.  It is a rule predicated upon sound public policy.  But the courts should not be so enamored with the Latin phase '*in pari delicto*' that they blindly extend the rule to every case where illegality appears somewhere in the transaction.  The fundamental purpose of the rule must always be kept in mind, and the realities of the situation must be considered.  Where, by applying the rule, the public cannot be protected because the transaction has been completed, where no serious moral turpitude is involved, where the defendant is the one guilty of the greatest moral fault, and where to apply the rule will be to permit the defendant to be unjustly enriched at the expense of the plaintiff, the rule should not be applied."  (*Norwood v. Judd* (1949) 93 Cal.App.2d 276, 288–289; see also *Asdourian v. Araj* (1985) 38 Cal.3d 276, 291 [" '[T]he rule is not an inflexible one to be applied in its fullest rigor under any and all circumstances.  A wide range of exceptions has been recognized.' "], superseded by statute on other grounds as stated in *Tufeld Corp. v. Beverly Hills Gateway, L.P.* (2022) 86 Cal.App.5th 12, 27–29; *Kashani v. Tsann Kuen China Enterprise Co.* (2004) 118 Cal.App.4th 531, 541-542

[California courts have carved out exceptions to the statutory and judicial language that illegal contracts are void and unenforceable].)

Whether a contract is illegal is a question of law to be determined from the circumstances of each particular case. (*Timney v. Lin* (2003) 106 Cal.App.4th 1121, 1126.) Because the facts here are undisputed, we apply the independent review standard to the question of whether the facts present an exception to the general rule against enforcing illegal contracts. (*Wackeen v. Malis* (2002) 97 Cal.App.4th 429, 437 [application of legal principles to undisputed facts invokes de novo review].)

Here the transaction was completed, and no serious moral turpitude is present. Significantly, Shokrian would be unjustly enriched with years of rent-free living if plaintiffs were not permitted to recover their damages for her false promise to them. And notably, plaintiffs did not seek to take advantage of the illegal waiver of RSO rights. Those rights act to protect against and stop unjust evictions, which is not an issue here. In this cause of action plaintiffs did not try to enforce the Lease Agreement to evict Shokrian based on her waivers; instead, they sought to recover damages for her duplicity, separate and apart from any rights afforded to her by the RSO and other tenant-protective statutes.

On another front, the cases Shokrian cites in support of her position are inapt. In *Wong v. Tenneco*, Wong owned and operated farms in Mexico when it was illegal for a non-Mexican citizen like Wong to do so. Wong sued in California on a contract for damages that were unrecoverable by him under Mexican Law. (*Wong, supra*, 39 Cal.3d 128–133.) Our Supreme Court declined to treat the case as a standard breach of contract claim, instead

17

deciding that Wong could not recover based on the doctrine of comity, our duty to respect Mexico's right to determine her own internal policies. (*Id*. at pp. 133–134.) Applying comity, the Court found that Wong's failure to comply with the requirements of Mexican law "cast a pall of illegality over all of his business transactions tied to the Mexican farming operation." (*Id*. at pp. 137–138.)

*Lee On v. Long* (1951) 37 Cal.2d 499 is also inapposite. There, gamblers sued the sheriff for money seized from gambling tables when the sheriff raided their illegal gambling operation. (*Id*. at pp. 500–501.) The Court found the money was derived from a violation of state gambling laws. Because " 'a party to an illegal contract cannot come into a court of law and ask to have his illegal objects carried out' " and because plaintiffs had pleaded guilty to criminal violations of the gaming law, they were not entitled to use the courts to recover their ill-gotten gains. (*Id*. at pp. 502–503.) Here plaintiffs were not seeking to have their illegal objects, i.e., the RSO waivers, carried out as they were not seeking to enforce either the Lease Agreement or the Addendum.

In *Wallace v. Opinham* (1946) 73 Cal.App.2d 25, 26, plaintiff sued to recover money he had lost in the illegal game of " 'Twenty-One.' " *Huber v. Peek-A-Boot, Inc.* (1961) 189 Cal.App.2d 512, 515–516 was a case where plaintiff's case was based on perjured testimony. In *Goldstein v. Enoch* (1967) 248 Cal.App.2d 891, 896–897, plaintiff had to rely on an illegal transaction to prove his case for fraud. Here, plaintiffs did not invoke the illegal terms in the documents. Their case hinged on proving Shokrian's false promise to move out upon 60 days notice after the tenancy expired.

18

In *Hydrotech Systems Ltd. v. Oasis Waterpark* (1991) 52 Cal.3d 988, 998, superseded by statute on other grounds as stated in *Montgomery Sansome LP v. Rezai* (2012) 204 Cal.App.4th 786, 794, an unlicensed contractor tried to evade Business and Professions Code section 7031, which precludes unlicensed contractors from recovery of damages, by alleging a cause of action for fraud. To the same effect was *Waisbren v. Peppercorn Productions, Inc.* (1995) 41 Cal.App.4th 246, 250–251, 262, where the underlying contract violated the Talent Agencies Act (Lab. Code, §§ 1700–1700.47). In *Yoo v. Jho* (2007) 147 Cal.App.4th 1249, 1252, 1254, the store that was sold was involved in the sale of counterfeit merchandise; the illegal object of the contract precluded any relief.

In each of these cases recovery of damages required the court to endorse or enforce an illegal contract, activity or transaction. Here the principal illegality was the waiver of RSO rights. That waiver was irrelevant to Shokrian's false promise to deliver the premises back to plaintiffs when her lease ended.

B. ***The Jury's Answers in the Special Verdict Are Not Inconsistent and its Decision Not to Award Any Damages for Reduction in Household Services is Supported by Substantial Evidence.***

Shokrian contends that the jury's answers in the special verdict denying Shokrian any recovery for the reduction of household services are internally inconsistent.

The inconsistent verdict rule is based upon the fundamental proposition that a factfinder may not make inconsistent determinations of fact based on the same evidence. An inconsistent verdict may arise from an inconsistency between or among answers within a special verdict or irreconcilable

19

findings. Where there is an inconsistency between or among answers within a special verdict, both or all the questions are equally against the law. The appellate court is not permitted to choose between inconsistent answers. (*Trejo v. Johnson & Johnson* (2017) 13 Cal.App.5th 110, 124.) The standard of review for inconsistency in a special verdict is de novo. (*Ibid.*) We also review a jury's factual findings for substantial evidence and will reverse only if defendant can show that the evidence was such as would justify a directed verdict in their favor. (*Mathews v. Happy Valley Conference Center, Inc.* (2019) 43 Cal.App.5th 236, 251.)

There was no inconsistency in the special verdict and it was supported by substantial evidence. In question 1, the jury acknowledged that the household services in question were "protected by the rent stabilization ordinance." This is true as a general proposition. In question 2, the jury also acknowledged, consistent with the evidence, that plaintiffs took away the services. This is also true as a general proposition. In question 3, the jury found that plaintiffs did not provide "a commensurate reduction in the rent for the reduction in housing services." That is true as well. In question 4, the jury concluded that the plaintiffs did not "demand, accept or retain rent above the maximum rent." That is correct—the collected rent remained the same throughout the tenancy.

The evidence at trial was that there was no provision for any household services in the Lease Agreement. According to Jonathan, he gave Shokrian the household services "without charge and as a goodwill gesture." Shokrian acknowledged there was nothing in the Lease Agreement about any of the household services at issue. The Lease Agreement itself bore this out. The Lease Agreement also provided that changes in the tenancy

needed to be in writing and signed by both parties. And there was no evidence of such an approved amendment. Under these facts, Terrell conceded at trial that to enforce a reduction in rent, the contract would have had to be amended to include those services. We find the jury's answers to be internally consistent and supported by the evidence. We deny as unnecessary Shokrian's request that we take judicial notice of the Rent Adjustment Commission Regulation 630 of the City of Los Angeles.

## DISPOSITION

The judgment is affirmed. Plaintiffs are to recover their costs on appeal.

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

STRATTON, P. J.

We concur:

WILEY, J.

VIRAMONTES, J.

21